T.C. Memo. 2012-176

UNITED STATES TAX COURT

SARI F. DEIHL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12937-06, 22897-08.          Filed June 21, 2012.

<u>Tim Alan Tarter</u>, for petitioner.

<u>Anne Ward Durning</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  These consolidated cases arise from petitioner's requests

for section 6015[1] relief with respect to the 1996-99 Federal income tax liabilities of

_____

[1]All section references are to the Internal Revenue Code in effect for the relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure.

petitioner and her deceased husband, Joseph Deihl.  Respondent determined that petitioner was not entitled to relief under section 6015.  Petitioner timely filed petitions seeking review of respondent's determination.  After concessions[2] and in accordance with our Opinion in Deihl v. Commissioner, 134 T.C. 156 (2010) (Deihl II), in which we held that section 6015(g)(2) barred petitioner from making an election under section 6015(b) and from requesting equitable relief under section 6015(f) for 1996 but did not otherwise bar her from requesting relief under section 6015(c) for 1996 or from requesting relief under section 6015(b), (c), and (f) for 1997 and 1998, the issues for decision are:  (1) whether petitioner is entitled to relief under section 6015(b) for 1997-99; (2) whether she is entitled to relief under section 6015(c) for 1996-99; and (3) whether she is entitled to relief under section 6015(f) for 1997-99.[3]

_____

[2]Respondent concedes that petitioner is entitled to partial relief for 1996-99 under sec. 6015(c) in that 50% of the 1996-99 tax liabilities are allocable to Mr. Deihl and she is not liable for the amounts so allocated.

[3]For 1999, unlike the other years at issue, although petitioner sought relief under sec. 6015(c) in her petition, she argued for relief at trial and on brief only under sec. 6015(b) and (f) and she asserted a corresponding claim for refund of the amount paid and applied to the 1999 liability.  Although we hold that petitioner is not entitled to sec. 6015(b) or (f) relief from the 1999 liability, respondent concedes that she is entitled to relief under sec. 6015(c) with respect to 1999, and we agree.  However, a taxpayer who qualifies for relief from a tax liability under sec. 6015(c) is not entitled to claim a refund for that part of the liability that has already been

(continued...)

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts is incorporated herein by this reference. Petitioner resided in Arizona when she petitioned this Court.

Background

Petitioner did not graduate from high school. She first met Joseph Deihl when she was 12 years old. In 1963 when she was 18 years old, petitioner married Mr. Deihl; and she remained married to him until his death on February 5, 2006.

During the period from 1963 to 1983 Mr. Deihl held various sales positions and petitioner and Mr. Deihl moved several times to accommodate his employment. In approximately 1982 Mr. Deihl traveled to Phoenix and purchased a company that manufactured tear-gas-spraying flashlights. After operating that company for about a year, Mr. Deihl and petitioner incorporated Mayor Pharmaceutical Laboratories, Inc. (Mayor), an S corporation. Petitioner worked for Mayor from approximately 1983 until sometime in 1992 or 1993, when Mr. Deihl told her that there was no reason for her to continue coming down to the company to work. Nevertheless, as

---

[3](...continued)
paid. See sec. 6015(g)(3).

more fully explained herein, petitioner continued to be involved with Mayor and related companies after 1993.

During the course of their marriage Mr. Deihl made the financial decisions for the family and petitioner paid the household bills. Petitioner filed joint income tax returns with Mr. Deihl, but she never reviewed them before signing them.

Mayor and KareMor

In the early 1980s petitioner and Mr. Deihl came up with the idea for and ultimately acquired a patent for a multivitamin spray that came to be known as VitaMist. In 1983 petitioner and Mr. Deihl incorporated Mayor to manufacture VitaMist.[4] Petitioner and Mr. Deihl jointly owned 100% of Mayor's stock and were at all relevant times officers of Mayor.

After experimenting with various methods of distribution, in 1992 Mr. Deihl and petitioner incorporated KareMor International, Inc. (KareMor), an S corporation, to market VitaMist products. Petitioner and Mr. Deihl jointly owned 100% of KareMor's stock and were at all relevant times officers of KareMor. KareMor marketed VitaMist through independent distributors who purchased VitaMist products from KareMor and then resold them. The distribution structure

---

[4]The VitaMist Web site refers to petitioner as a "co-founder" of the VitaMist enterprise. Co-founder Letter, http://www.vitamist.com/Articles.asp?ID=405 (last visited June 19, 2012).

had multiple levels because KareMor encouraged distributors to recruit additional distributors known as downline distributors. Distributors advanced in the KareMor hierarchy as they recruited additional downline distributors.

Although petitioner did not work at Mayor during the years at issue, she worked for KareMor in 1996 and 1997 and earned wages of $15,000 and $44,000, respectively. According to the Form W-2, Wage and Tax Statement, attached to petitioner's 1998 return, she also worked at Creative Personnel Resources and earned $84,613.30 in wages.[5] She also regularly visited the corporate offices to sign corporate documents, and she signed checks drawn on the Mayor and KareMor accounts throughout 1996-98. During 1996-99 petitioner used two corporate credit cards for a variety of personal and corporate purchases.

Petitioner involved herself in Mayor and KareMor in other ways. In a related case, we described her involvement as follows:

> [Petitioner and Mr. Deihl] * * * and members of their extended family played a prominent role in interacting personally with distributors at KareMor events. In these interactions, petitioners believed that it was critical for every aspect of their lives, from their attire and personal grooming to their residence, to portray an appearance of extreme affluence and success. Petitioners felt that distributors who were impressed to the point of being overwhelmed

---

[5]No Forms W-2 are attached to the 1999 joint return that is in the record.

with what could be achieved through multilevel marketing would be encouraged to build their own downline networks in hopes of reaping similar benefits.

In execution of this strategy, * * * [Petitioner and Mr. Deihl] hosted at their residence a number of events * * * training sessions, meetings, and entertainment functions * * *

Deihl v. Commissioner, T.C. Memo. 2005-287 (Deihl I).  Petitioner planned many of the KareMor events, attended all of the KareMor conventions, and hosted numerous events at her and Mr. Deihl's Paradise Valley home.  She also traveled with Mr. Deihl on business and headed Women of KareMor, an organization for wives of distributors.

Since Mr. Deihl's death and through the date of trial, petitioner has operated the VitaMist business through Mayor and other business entities.[6]

Other Business Entities

Petitioner and/or Mr. Deihl also held ownership interests in other business entities,[7] including but not limited to the following:

_____

[6]Before the date of trial the VitaMist Web site contained a marketing statement petitioner signed as "Co-Founder & CEO, Mayor Pharmaceutical Labs".

[7]Petitioner testified that "Right now the companies are insolvent."  We do not find this testimony to be credible.  Petitioner offered no documentation such as financial statements, tax returns, account statements, corporate books and records, or appraisals to substantiate her testimony.  In addition, petitioner acknowledged that some part of the family business is still operating and, as of the trial date, had

(continued...)

• Phoenix Foundation, a company (sometimes referred to as a "genealogy" company) that was apparently formed to receive the commissions from downline sales to which petitioner and Mr. Deihl were entitled under the multilevel marketing structure used to market VitaMist products;

• Pharmanutra, Inc., a company that is also part of the genealogy and that receives commissions for the benefit of petitioner. Petitioner holds all of the officer positions and is a director of this company, which was incorporated in Nevada in 2010, several years after Mr. Deihl died;

• Spray Fun, Inc., a company incorporated in Nevada in 2003 to sell vitamins. Petitioner holds all of the officer positions and is a director of the company;

• Legacy Lodging II, an investment entity;

• Windy City Properties, LLC, a real estate holding company that held title to, among other things, the property used as the corporate offices at 2401 South 24th St., Phoenix, Arizona. That property was eventually sold to petitioner's

---

[7](...continued)
16 employees. Her son, William Deihl, continues to work for the family business, and petitioner is the chief executive officer, according to the VitaMist Web site.

sons[8] on a date and for a price that do not appear in the record.  The property at 2401 South 24th St. is still used as the VitaMist companies' headquarters;

- Regency Medical Research, a company that was apparently formed by Mr. Deihl to market products on a retail basis to doctors;

- VitaMist, Ltd., a company formed to market VitaMist products that apparently was the successor to KareMor;[9]

- Spoiled Brat, Ltd., a company formed by Mr. Deihl to market a line of facial products named after petitioner;

- Alternative Employment Solutions, a company that leases employees to various business entities involved in the manufacturing and distribution of VitaMist products;

---

[8]One of petitioner's sons also may have received the proceeds from her sale of residential property in 2006.  Petitioner testified that the property in question, which was titled in her name, was her son's property and that she could not remember who received the sale proceeds.  Petitioner acknowledged that the sale price may have been $1,255,000 and testified that she could not remember whether she reported the sale on her 2006 return.

[9]The record does not explain how, when, or by whom VitaMist, Ltd., was formed, nor does it reveal whether VitaMist, Ltd., purchased assets from KareMor for consideration.  The record also does not indicate who owns VitaMist, Ltd.  Absent proof to the contrary, it is reasonable to infer from the limited record that petitioner holds some ownership interest in VitaMist, Ltd.

• Creative Personnel Resources, Inc., a company that was the same as Alternative Employment Solutions and of which petitioner was an officer and director;[10]

• Lifestyle Advantage, Ltd., another company organized by Mr. Deihl to sell products;

• Liberty Group International, another company organized to sell products; and

• Left Field Productions, Inc., a company organized to put on shows.

Paradise Valley Home

During the years at issue petitioner and Mr. Deihl lived in a 10,000-square-foot residence in Paradise Valley, Arizona (Paradise Valley home).  Petitioner and Mr. Deihl owned the Paradise Valley home as community property with right of survivorship.

In the late 1980s petitioner and Mr. Diehl purchased the Paradise Valley home for $750,000 cash and almost immediately began an extensive remodeling project on the property, which continued for several years.  The improvements were

---

[10]The corporation was dissolved on September 16, 2005, for failure to file its 2005 annual report with the Arizona Corporation Commission.

paid for at least in part by KareMor,[11] which claimed amortization expense deductions with respect to the improvement costs on its 1996-98 corporate tax returns. See Deihl I. In December 2006, after Mr. Deihl's death, petitioner, the surviving and sole owner, sold the Paradise Valley home for approximately $4,100,000. The final disbursement report reflects that petitioner received a disbursement of $767,017.54 and that the Department of Internal Revenue received a disbursement of $360,888.81 from the sale proceeds. Petitioner used a portion of the money she received from the sale of the Paradise Valley home to purchase a home on Cactus Road in Scottsdale, Arizona (Cactus Road home), for $1,350,000 in 2006. Petitioner made a downpayment of approximately $270,000 and financed the balance of the purchase price and closing costs with a mortgage of $1,080,000.[12]

---

[11]Respondent alleged that KareMor and Mayor paid for over $2 million of improvements to the Paradise Valley home during 1996 and 1997 that were reported as expenses on the corporation's corporate tax returns for those years.

[12]Petitioner testified at trial that the value of her Cactus Road home had declined substantially since she purchased it, and she estimated that as of the trial date the property was worth substantially less than the mortgage balance. Petitioner testified that she has ceased making mortgage payments and the property was in foreclosure as of the trial date.

Petitioner and Mr. Deihl's Standard of Living

Petitioner and Mr. Deihl drove expensive cars, took vacations and business trips to Europe, Las Vegas, and the Caribbean, and purchased fine jewelry. They also invested in commercial property, such as office buildings and strip malls, and held several investment accounts. Petitioner and Mr. Deihl were members of the Gainey Ranch Golf Club and the Arizona Club, at which they entertained people in connection with their business.

Petitioner's Requests for Section 6015 Relief

Petitioner and Mr. Deihl filed joint Federal income tax returns for 1996-99.

Tax Years 1996-98

Respondent issued notices of deficiency to petitioner and Mr. Deihl for 1996-98. Petitioner and Mr. Deihl subsequently filed a petition for redetermination of respondent's determinations.

In Deihl I we held that petitioner and Mr. Deihl were not entitled to certain deductions for expenses claimed through and in connection with Mayor and KareMor,[13] a reduction in gross income related to certain items of Mayor's cost of

---

[13]We held that petitioner and Mr. Deihl were not entitled to the following claimed deductions: (1) capitalized residence improvement deductions related to the Paradise Valley home; (2) maintenance and landscaping deductions related to residential property and unsubstantiated maintenance and landscaping deductions;

(continued...)

goods sold, or a reduction in adjusted gross income for alleged duplicate reporting. We concluded that petitioner and Mr. Deihl were also liable for section 6662(a) accuracy-related penalties.

We entered our decision as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| 1996 | [1]$1,002,062 | $200,412 |
| 1997 | 2,196,184 | 439,237 |
| 1998 | 629,495 | 125,899 |

[1]All monetary amounts have been rounded to the nearest dollar.

On or about March 6, 2007, petitioner signed a Form 8857, Request for Innocent Spouse Relief. Petitioner requested relief under section 6015(b), (c), and (f) for 1996-98. On August 22, 2008, respondent issued a notice of determination denying petitioner's request for relief for each of those years. Petitioner timely filed a petition for review of respondent's determination.

---

[13](...continued)
(3) security costs related to the Paradise Valley home and other unsubstantiated security costs; (4) dues for membership in various social clubs and expenses incurred at those clubs; (5) unsubstantiated entertainment expenses; (6) unsubstantiated business gift expenses; (7) clothing costs; (8) equipment and furnishings expenses; (9) unsubstantiated travel expenses; (10) charitable contributions; and (11) unsubstantiated promotional and marketing expenses. See Deihl v. Commissioner, T.C. Memo. 2005-287.

Tax Year 1999

Respondent issued a notice of deficiency to petitioner and Mr. Deihl for 1999. Respondent subsequently assessed an income tax deficiency for 1999, (which resulted from an examination of KareMor's return as well as respondent's disallowance of depreciation deductions for improvements made to the Paradise Valley home), interest and penalties (collectively, 1999 tax liability). Because petitioner and Mr. Deihl failed to pay the 1999 tax liability, respondent mailed them a Letter 1058, Notice of Levy and Your Right to a Hearing, for 1999. In response, petitioner's representative, Donald W. McPherson, submitted a Form 12153, Request for a Collection Due Process or Equivalent Hearing. Before and during the hearing Mr. McPherson raised spousal defenses for petitioner and requested that she receive relief under section 6015(a) or (f).

On April 6, 2006, respondent issued to petitioner and Mr. Deihl a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 sustaining respondent's proposed levy. In the notice of determination the Appeals Officer concluded that petitioner was not entitled to relief under section 6015. Petitioner timely filed a petition contesting respondent's determination.

Subsequently, on November 15, 2006, respondent filed a Notice of Federal Tax Lien for 1999. Because respondent filed the lien before petitioner's sale of the

Paradise Valley home, part of the sale proceeds was used to satisfy petitioner and Mr. Deihl's 1999 tax liability.

Procedural History

We consolidated petitioner's two petitions for section 6015 relief for 1996-98 and 1999. Subsequently, we severed the issue of whether section 6015(g)(2) barred petitioner's claims for section 6015 relief for 1996-98,[14] which we decided in an Opinion issued on February 23, 2010. See Deihl II.

In Deihl II respondent argued that section 6015(g)(2) barred petitioner from claiming relief from joint and several liability under section 6015(b), (c), and (f) with respect to her joint Federal income tax liabilities for 1996, 1997, and 1998. We held that (1) section 6015(g)(2) barred petitioner from seeking relief under section 6015(b) and (f) for 1996; (2) section 6015(g)(2) did not bar her from seeking relief under section 6015(c) for 1996; and (3) section 6015(g)(2) did not bar her from seeking relief under section 6015(b), (c), and (f) for 1997 and 1998. Id.

---

[14]Sec. 6015(g)(2) provides that, in the case of any request for relief under sec. 6015(b), (c), or (f), "if a decision of a court in any prior proceeding for the same taxable year has become final, such decision shall be conclusive except with respect to the qualification of the individual for relief which was not an issue in such proceeding." However, the exception does not apply if the individual participated meaningfully in the prior proceeding. Sec. 6015(g)(2).

OPINION

## I.    Evidentiary Matters

Petitioner reserved an objection to Exhibit 30-J, the trial transcript from Deihl I. The Deihl I transcript includes the testimony of five witnesses:  (1) petitioner; (2) Mr. Deihl; (3) Robert J. Hartmann, an attorney who worked for Mayor and KareMor; (4) Martin D. Goltz, who worked as a consultant for Mayor and KareMor before becoming CFO of KareMor in the mid-1990s; and (5) Kermit Lennick, a contractor who remodeled the Paradise Valley property.  Petitioner withdrew her objection with respect to her own testimony in the Deihl I transcript but not with respect to the rest of the transcript.

In connection with the partial trial in docket No. 22897-08, Diehl II, the parties stipulated the admissibility of the entire transcript from Diehl I.  Neither party reserved an objection to the transcript, which was marked and admitted as Exhibit 14-J during the partial trial.  The parties did not limit the use of the transcript to the specific issue that was the subject of the partial trial and decided in Diehl II.

By reason of the above, respondent contends that Exhibit 30-J is already in evidence pursuant to Rule 91(e).  Rule 91(e) provides:

(e) Binding Effect: A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires. A stipulation and the admissions therein shall be binding and have effect only in the pending case and not for any other purpose, and cannot be used against any of the parties thereto in any other case or proceeding.

Alternatively, respondent contends that to the extent Exhibit 30-J contains the testimony of Mr. Deihl, Exhibit 30-J is admissible under the former testimony exception to the hearsay rule.

Neither party relied on the contested part of the Deihl I transcript as the sole basis for a requested finding of fact in that party's posttrial briefs, and we do not rely on the transcript to decide this case. Consequently, it is not necessary for us to admit the remaining portion of the Deihl I transcript. For these reasons, we shall exclude the remaining portion of the Deihl I transcript. See Fed. R. Evid. 401(a).

II.    Section 6015 Relief

Generally, taxpayers who file a joint Federal income tax return are each responsible for the accuracy of their return and are jointly and severally liable for the entire tax liability due for that year. Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000). In certain circumstances, however, a spouse may obtain

relief from joint and several liability by satisfying the requirements of section 6015.[15]

Section 6015(a)(1) provides that a spouse may request relief from joint and several liability under section 6015(b) for an understatement of tax on a joint return. Additionally, section 6015(a)(2) provides that an eligible spouse may request to limit her liability for any deficiency with respect to a joint return under section 6015(c). If complete relief is not available under subsection (b) or (c) of section 6015, a spouse may request equitable relief under section 6015(f).

Petitioner contends that she is entitled to relief from all of the 1997-99 liabilities under section 6015(b) or (f). Petitioner also requested relief from the 1996 liability and the 1997-99 liabilities under section 6015(c) in her petition, contending that no part of the 1996-99 deficiencies is attributable to her.

Section 6015(e) confers jurisdiction on this Court to review petitioner's requests for relief from joint and several liability. A spouse who has requested relief may contest the Commissioner's denial of that relief by timely filing a petition in

---

[15]Sec. 6015 applies to tax liabilities arising after July 22, 1998, and to tax liabilities arising on or before July 22, 1998, that remain unpaid as of such date. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, sec. 3201(g), 112 Stat. at 740.

this Court.  Sec. 6015(e).  We address petitioner's request for relief under section

6015(b), (c), and (f) in turn.

    A.    <u>Section 6015(b)</u>

Section 6015(b) authorizes the Secretary[16] to grant relief if the taxpayer

satisfies the requirements of subparagraphs (A) through (E) and provides as follows:

> SEC. 6015(b).  Procedures for Relief From Liability Applicable to All Joint Filers.--
>
> > (1) In general.--Under procedures prescribed by the Secretary, if--
> >
> > > (A) a joint return has been made for a taxable year;
> > >
> > > (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
> > >
> > > (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

---

[16]The term "Secretary" means "the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B), and the term "or his delegate" means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context", sec. 7701(a)(12)(A)(i).

(D) taking into account all of the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The requirements of section 6015(b)(1) are stated in the conjunctive. Therefore, if the requesting spouse fails to satisfy any one of the requirements, she does not qualify for relief. Alt v. Commissioner, 119 T.C. 306, 313 (2002), aff'd, 101 Fed. Appx. 34 (6th Cir. 2004). The requesting spouse bears the burden of proving that she satisfies each requirement of section 6015(b)(1). See Rule 142(a).

Respondent does not dispute that petitioner meets the requirements in subparagraphs (A) and (E) for 1997-99. Respondent contends that petitioner fails to satisfy the requirements of subparagraphs (B) through (D). Petitioner disagrees.

With respect to subparagraph (B) of section 6015(b)(1), both parties agree that the understatements were attributable to erroneous deductions of Mayor and

KareMor expenses and disallowed depreciation on the Paradise Valley home. Respondent argues that 50% of the understatements are allocable to petitioner because petitioner and Mr. Deihl jointly owned and operated Mayor and KareMor. Petitioner argues that the understatements are allocable solely to Mr. Deihl because she did not assist Mr. Deihl in managing Mayor or KareMor or in making any related financial decisions.

Erroneous items are allocable to the individual whose activities gave rise to the items. Sec. 1.6015-1(f)(1), Income Tax Regs. While it may be a factor, joint ownership alone does not dictate whether an erroneous item is allocated to both spouses. Buchine v. Commissioner, T.C. Memo. 1992-36, aff'd, 20 F.3d 173 (5th Cir. 1994). Generally, an allocation is made without regard to community property laws. Sec. 1.6015-1(f)(1), Income Tax Regs. A requesting spouse "who voluntarily agrees to enter into an investment and who actively participates in it" cannot allocate the entire investment to the nonrequesting spouse. Juell v. Commissioner, T.C. Memo. 2007-219; see also Olson v. Commissioner, T.C. Memo. 2009-294. However, a requesting spouse who does not actually participate in the investment or business activity, even if she is listed as a shareholder or partner and signed investment documents, may avoid an allocation of liability to her in certain circumstances. See Juell v. Commissioner, T.C. Memo. 2007-219. In Juell, we

declined to allocate understatements to the requesting spouse when the requesting spouse did not invest any funds in the partnership, attend any partnership meetings, or have access to any partnership funds.

In contrast, we have allocated understatements resulting from the adjustment of partnership items to a requesting spouse who agreed to invest in the partnership, signed documents relating to the partnership, and wrote checks to the partnership drawn on the spouses' joint bank account. See Bartak v. Commissioner, T.C. Memo. 2004-83, aff'd, 158 Fed. Appx. 43 (9th Cir. 2005). We have also allocated understatements to a requesting spouse where the spouse agreed to make the investment in the business, jointly invested in the business, and participated actively in the business. See Abelein v. Commissioner, T.C. Memo. 2004-274.

Petitioner and Mr. Deihl jointly owned 100% of the stock in, were officers of, and controlled Mayor and KareMor. Petitioner signed corporate checks, used corporate credit cards, and deposited money from Mayor and KareMor into her personal accounts. Petitioner actively participated in the Mayor and KareMor businesses through her event planning and through the Women of KareMor organization. Furthermore, petitioner and Mr. Deihl viewed themselves and their lifestyle as a key element in KareMor's success. Petitioner cannot convincingly

argue that she did not actively participate in the business activity when she and Mr. Deihl relied on their personal interactions to spur business growth.

Petitioner testified that she performed these tasks as directed by Mr. Deihl and that she never made any financial decisions related to Mayor and KareMor.[17] Given the level of petitioner's involvement with the corporations, however, her professed lack of interest and involvement in corporate finances is not credible, nor is it sufficient to support an allocation of all of the understatements attributable to the disallowance of Mayor and KareMor deductions to Mr. Deihl.

Petitioner failed to prove that the erroneous items giving rise to the understatement of tax are attributable solely to Mr. Deihl.  Because petitioner failed to satisfy the subparagraph (B) requirement, she is not entitled to relief under section 6015(b).  We need not address whether petitioner satisfied the requirements of subparagraphs (C) and (D) of section 6015(b)(1).  Accordingly, we sustain respondent's determination to deny petitioner relief under section 6015(b) for 1997-99.

_____

[17]Petitioner testified that she personally paid the contractors who performed the renovations on the Paradise Valley home with either personal funds or with corporate funds.  Although petitioner testified that Mr. Deihl directed her to pay the contractors, she personally paid for the renovations and used corporate funds to do so.  Petitioner introduced no other evidence to support her argument that the Paradise Valley depreciation deductions are allocable solely to Mr. Deihl.

B.    Section 6015(c)

Under section 6015(c), if the requesting spouse is no longer married to or is legally separated from the spouse with whom she filed the joint return,[18] the requesting spouse may seek to limit her liability for a deficiency as provided in section 6015(d).  Sec. 6015(c)(1), (3)(A)(i)(I).  A requesting spouse may request section 6015(c) relief any time after a deficiency is asserted but no later than two years after the date on which the Secretary has begun collection activities with respect to the requesting spouse.  Sec. 6015(c)(3)(B).

In general, section 6015(d) provides that any item giving rise to a deficiency on a joint return is allocated to the spouses as if they had filed separate returns.  Sec. 6015(d)(3)(A).  The requesting spouse is liable only for her proportionate share of the deficiency that results from such allocation.  Sec. 6015(d)(1).  If an item giving rise to a deficiency provided a tax benefit on the joint return to the nonrequesting spouse, the item is allocated to the nonrequesting spouse.  Sec. 6015(d)(3)(B); Hopkins v. Commissioner, 121 T.C. 73, 83-86 (2003).  The requesting spouse bears the burden of establishing the amount of the deficiency allocable to her.  Sec. 6015(c)(2).

---

[18]An electing spouse is no longer married if she is widowed.  See Rosenthal v. Commissioner, T.C. Memo. 2004-89.

Unallowable deductions attributable to a business or investment are allocated to the spouse who owned the business or investment. Sec. 1.6015-3(d)(2)(iv), Income Tax Regs. Generally, an erroneous deduction is allocated in proportion to each spouse's ownership interest. Id. The regulations provide that, "[i]n the absence of clear and convincing evidence supporting a different allocation, an erroneous deduction item relating to an asset that the spouses owned jointly is generally allocated 50% to each spouse". Id.

Both parties agree that (1) petitioner qualifies for section 6015(c) relief for 1996-99 and (2) the deficiencies resulted from erroneous deductions attributable to Mayor and KareMor and disallowed depreciation deductions related to the Paradise Valley home. Respondent concedes that 50% of the deficiencies are allocable to Mr. Deihl but contends that the other 50% are allocable to petitioner because she jointly owned and controlled Mayor and KareMor. Petitioner contends, however, that the entire deficiency is allocable to Mr. Deihl. She argues that joint ownership of the corporations is not determinative of whether the disallowed deductions are jointly allocable to her and Mr. Deihl. Because petitioner contends that she held her interest in Mayor and KareMor purely in a nominal capacity, made no financial decisions regarding the corporations, and never saw the corporate tax returns, she concludes that the deficiency is not

allocable to her. Petitioner relies on Rowe v. Commissioner, T.C. Memo. 2001-325, and McKnight v. Commissioner, T.C. Memo. 2006-155, to support her argument.

In Rowe, we declined to allocate farming activity losses to the requesting spouse even though the requesting spouse was listed as a proprietor of the business on her tax returns. We stated: "the evidence in the record reflects that petitioner's involvement in the farming activity * * * was minimal and purely social in nature. Other than infrequent attendance at horse shows to support her son, petitioner's only apparent link to the activity is that her name is listed as a proprietor on the * * * tax returns." Similarly, in McKnight, we declined to allocate S corporation income to the requesting spouse. Although the requesting spouse signed the articles of incorporation for the S corporation and was listed as a director, she did not make a capital contribution, participate in decisionmaking, receive stock, have signatory authority on the corporate bank account, know what title she held with the corporation, or receive any distributions or wages from the corporation.

Petitioner failed to prove that the items giving rise to the deficiencies are allocable solely to Mr. Deihl. Unlike the requesting spouses in Rowe and McKnight, petitioner actively participated in the business activities of Mayor and

KareMor as described supra pp. 4-6. While petitioner's role was predominantly social, she engaged in those social activities as a business strategy and not merely for personal enjoyment.

Because petitioner and Mr. Deihl jointly owned Mayor and KareMor and were both active in the businesses, we conclude that 50% of the Mayor and KareMor items giving rise to the deficiency are allocable to each spouse. Petitioner failed to produce clear and convincing evidence supporting a different allocation. See sec. 1.6015-3(d)(2)(iv), Income Tax Regs. Furthermore, petitioner failed to prove that the erroneous depreciation deductions are allocable solely to Mr. Deihl. Petitioner owned the Paradise Valley home with Mr. Deihl, she lived in the home during the years at issue, and she personally paid for the improvements on which the depreciation deductions were based. She failed to produce any evidence supporting a different allocation of the depreciation deductions. Therefore, we sustain respondent's determination that petitioner is entitled to relief only from 50% of the liabilities for 1996-99 under section 6015(c).

C.    Section 6015(f)

Section 6015(f) provides an alternative means of relief for a requesting spouse who does not qualify for relief under section 6015(b) or (c). Because we

have not relieved petitioner of all liability for the 1997-99 deficiencies, we now consider whether she is entitled to any additional relief under section 6015(f).

Under section 6015(f), the Secretary may grant relief where "it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)". Sec. 6015(f)(1). Pursuant to section 6015(f), the Commissioner has prescribed guidelines in Rev. Proc. 2003-61, 2003-2 C.B. 296,[19] for determining whether the requesting spouse qualified for relief under that section. Generally, the Commissioner has analyzed requests for section 6015(f) relief filed on or after November 1, 2003, using the procedures set forth in Rev. Proc. 2003-61, supra, and this Court has considered the guidelines, but is not bound by them, in evaluating the facts and circumstances of a case in order to decide whether equitable relief is appropriate. See Pullins v. Commissioner, 136 T.C. 432, 438-439 (2011); Porter v. Commissioner, 132 T.C. 203, 210 (2009).

---

[19]Rev. Proc. 2003-61, 2003-2 C.B. 296, supersedes Rev. Proc. 2000-15, 2000-1 C.B. 447, and is effective for requests for sec. 6015(f) relief filed on or after November 1, 2003. Rev. Proc. 2003-61, secs. 6 and 7, 2003-2 C.B. at 299.

On January 5, 2012, the IRS released Notice 2012-8, 2012-4 I.R.B. 309,[20] a proposed revenue procedure that, if finalized, would revise the factors the IRS will use to evaluate a requesting spouse's claim for equitable relief under section 6015(f) and would supersede Rev. Proc. 2003-61, supra. Notice 2012-8, supra, provides that "until the revenue procedure is finalized, the Service will apply the provisions in the proposed revenue procedure instead of Rev. Proc. 2003-61 in evaluating claims for equitable relief under section 6015(f)."

The parties contend that this Court should apply the provisions of the proposed revenue procedure set forth in Notice 2012-8, supra, in determining whether petitioner is entitled to equitable relief under section 6015(f).[21] However,

---

[20]Notice 2012-8, 2012-4 I.R.B. 309, updates the guidelines for determining whether a requesting spouse is entitled to relief from joint and several liability under secs. 66(c) and 6015(f). The Commissioner released Notice 2012-8, supra, to expand "how the IRS will take into account abuse and financial control by the nonrequesting spouse in determining whether equitable relief is warranted." Id. In particular, Notice 2012-8, supra, provides that abuse or lack of financial control may mitigate factors that otherwise weigh against granting relief from joint and several liability. See id.

[21]On January 30, 2012, we held a conference call with the parties during which counsel for the parties requested the opportunity to state their positions with respect to the proper interpretation and application of Notice 2012-8, supra, to the facts of these cases. By order dated February 15, 2012, we ordered the parties to file a status report informing the Court of their positions with respect to the proper interpretation and application of Notice 2012-8, supra, in these cases. The parties contend that Notice 2012-8, supra, applies to these cases.

in <u>Sriram v. Commissioner</u>, T.C. Memo. 2012-91, slip op. at 9 n.7, we took the position that we would "continue to apply the factors in Rev. Proc. 2003-61, 2003-2 C.B. 296, in view of the fact that the proposed revenue procedure is not final and because the comment period under the notice only recently closed." Additionally, because our holding in <u>Sriram</u> did not turn on any single factor as revised in the proposed revenue procedure, we called attention in the opinion to the effect, if any, of a revised factor only to the extent we deemed it necessary for clarity. <u>Id.</u> We adopt a similar approach here. We shall decide whether petitioner is entitled to relief under section 6015(f) by considering all of the relevant facts and circumstances, evaluating them through the prism of Rev. Proc. 2003-61, <u>supra</u>, and noting where appropriate how the analysis used in Rev. Proc. 2003-61, <u>supra</u>, would change if the proposed revenue procedure in Notice 2012-8, <u>supra</u>, had actually been finalized. In any event, our approach to deciding whether petitioner qualifies for relief under section 6015(f) and our conclusion remain the same regardless of whether we apply the analysis of Rev. Proc. 2003-61, <u>supra</u>, or adopt the approach proposed in Notice 2012-8, <u>supra</u>.

We consider all relevant facts and circumstances in deciding whether a requesting spouse is entitled to relief under section 6015(f). <u>Porter v. Commissioner</u>, 132 T.C. at 210. In making our analysis, we apply a de novo

standard of review and a de novo scope of review, see id., and we examine whether the requirements set forth in Rev. Proc. 2003-61, supra, were satisfied, see, e.g., Pugsley v. Commissioner, T.C. Memo. 2010-255; O'Meara v. Commissioner, T.C. Memo. 2009-71. Petitioner bears the burden of proving that she is entitled to relief under section 6015(f). See Porter v. Commissioner, 132 T.C. at 210; see also Rule 142(a).

Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297-298, lists seven threshold requirements that a requesting spouse must satisfy before the Commissioner will consider a request for relief under section 6015(f):

> (1) The requesting spouse filed a joint return for the taxable year for which he or she seeks relief.

> (2) Relief is not available to the requesting spouse under section 6015(b) or (c).

> (3) The requesting spouse applies for relief no later than two years after the date of the Service's first collection activity after July 22, 1998, with respect to the requesting spouse. * * * [22]

---

[22]Notice 2012-8, sec. 4.01(3)(a), 2012-4 I.R.B. at 312, provides that "[i]f the requesting spouse is applying for relief from a liability or a portion of a liability that remains unpaid, the request for relief must be made before the expiration of the period of limitation on collection of the income tax liability, as provided in section 6502. Generally, that period expires 10 years after the assessment of tax." Respondent does not contend that petitioner failed to satisfy the threshold requirement of Rev. Proc. 2003-61, sec. 4.01(3), 2003-2 C.B. at 297.

(4) No assets were transferred between the spouses as part of a fraudulent scheme by the spouses.

(5) The nonrequesting spouse did not transfer disqualified assets to the requesting spouse. * * *

(6) The requesting spouse did not file or fail to file the return with fraudulent intent.

(7) The income tax liability from which the requesting spouse seeks relief is attributable to an item of the individual with whom the requesting spouse filed the joint return (the "nonrequesting spouse"), unless one of the following exceptions applies:

   *  *  *  *  *  *  *

(b) <u>Nominal ownership</u>. If the item is titled in the name of the requesting spouse, the item is presumptively attributable to the requesting spouse. This presumption is rebuttable. * * *

   *  *  *  *  *  *  *

(d) <u>Abuse not amounting to duress</u>. If the requesting spouse establishes that he or she was the victim of abuse prior to the time the return was signed, and that, as a result of the prior abuse, the requesting spouse did not challenge the treatment of any items on the return for fear of the nonrequesting spouse's retaliation, the Service will consider granting equitable relief although the deficiency or underpayment may be attributable in part or in full to an item of the requesting spouse.

Petitioner satisfies Rev. Proc. 2003-61, sec. 4.01(1)-(6).[23]  Respondent contends that petitioner does not satisfy section 4.01(7) because the remaining liability is attributable to her items.  Petitioner contends that she satisfies section 4.01(7) because either the nominal ownership exception or the abuse not amounting to duress exception applies.

### 1. Nominal Ownership

Under Rev. Proc. 2003-61, sec. 4.01(7)(b),[24] a requesting spouse who is a named owner may rebut the presumption of ownership.  See Maluda v. Commissioner, 431 Fed. Appx. 130 (3d Cir. 2011), aff'g T.C. Memo. 2009-281. Rev. Proc. 2003-61, sec. 4.01(7)(b) provides the following example:

> (b) Nominal ownership. * * * For example, H opens an individual retirement account (IRA) in W's name and forges W's signature on the IRA in 1998.  Thereafter, H makes contributions to the IRA and in 2002 takes a taxable distribution from the IRA.  H and W

[23]In his brief respondent contends that petitioner does not satisfy Rev. Proc. 2003-61, sec. 4.01(2).  We reject this contention.  As described supra pp. 19-27, petitioner does not qualify for relief under sec. 6015(b) and qualifies for only partial relief under sec. 6015(c).  Because we have not relieved petitioner of all liability for the 1997-99 deficiencies, she satisfies Rev. Proc. 2003-61, sec. 4.01(2).  See, e.g., Phemister v. Commissioner, T.C. Memo. 2009-201.  Furthermore, in his status report filed March 16, 2012, respondent concedes that petitioner meets all of the threshold conditions except sec. 4.01(7).

[24]Notice 2012-8, supra, proposes no significant changes to the nominal ownership exception.  See Notice 2012-8, secs. 3, 4.01(7)(b), 2012-4 I.R.B. at 311-312.

> file a joint return for the 2002 taxable year, but do not report the taxable distribution on their joint return. The Service later proposes a deficiency relating to the taxable IRA distribution and assesses the deficiency against H and W. W requests relief from joint and several liability under section 6015. W establishes that W did not contribute to the IRA, sign paperwork relating to the IRA, or otherwise act as if W were the owner of the IRA. W thereby rebutted the presumption that the IRA is attributable to W.

Furthermore, if the requesting spouse acts as an owner of the investment, the requesting spouse cannot avoid attribution. See Bell v. Commissioner, T.C. Memo. 2011-152.

Petitioner and Mr. Deihl jointly owned Mayor and Karemor; 50% of Mayor and of KareMor is presumptively attributable to petitioner. Petitioner has not produced evidence sufficient to rebut this presumption. In the example in Rev. Proc. 2003-61, sec. 4.01(7)(b), the requesting spouse had no knowledge of the investment and her nominal ownership resulted from the nonrequesting spouse's forgery. Unlike the spouse in the example, petitioner knew about Mayor and KareMor and knew that she owned 50% of both corporations. Petitioner acted as an owner of the corporations by signing corporate documents and checks, using corporate credit cards, drawing a salary from KareMor, and actively participating in business activities. We conclude that the nominal ownership exception does not apply.

## 2. Abuse Not Amounting to Duress

Under Rev. Proc. 2003-61, sec. 4.01(7)(d),[25] if the requesting spouse proves that she was a victim of abuse, section 6015(f) relief may be granted even though the liability is attributable to items of the requesting spouse. For purposes of innocent spouse relief, abuse includes verifiable physical harm as well as severe psychological mistreatment. See Nihiser v. Commissioner, T.C. Memo. 2008-135. If the requesting spouse did not question or disobey the nonrequesting spouse for fear of such abuse, the abuse exception applies. Thomassen v. Commissioner, T.C. Memo. 2011-88; Stephenson v. Commissioner, T.C. Memo. 2011-16.

This Court requires substantiation, or at a minimum, specificity, with regard to allegations of abuse. See Nihiser v. Commissioner, T.C. Memo. 2008-135. A generalized claim of abuse is insufficient. See Thomassen v. Commissioner, T.C. Memo. 2011-88; Knorr v. Commissioner, T.C. Memo. 2004-212. To carry this burden, it is helpful for the requesting spouse to provide corroborating evidence or substantiation of the alleged abuse. See Thomassen v. Commissioner, T.C. Memo. 2011-88.

---

[25]Notice 2012-8, supra, proposes no significant changes to the abuse not amounting to duress exception to the threshold requirement of Rev. Proc. 2003-61, sec. 4.01(7). See Notice 2012-8, secs. 3, 4.01(7)(d), 2012-4 I.R.B. at 311-312.

Petitioner testified that Mr. Deihl physically and mentally abused her throughout their marriage. She further testified that she never questioned Mr. Deihl's decisions for fear of retaliation. Petitioner testified that she did not report the physical abuse to the police or other law enforcement authorities. Petitioner's testimony was not specific as to the timeframe of the alleged abuse, and she did not testify as to any specific abuse that occurred during the relevant timeframe. Petitioner did not testify that Mr. Deihl's physical or verbal abuse affected her decision to file or sign a joint return. When questioned about signing the joint returns, petitioner did not mention Mr. Deihl's physical or verbal abuse. Petitioner simply testified that she signed the joint returns when Mr. Deihl presented them to her.

Petitioner's son, William M. Deihl, testified that he heard Mr. Deihl verbally abusing her and saw signs of physical abuse, such as bruises. William M. Deihl testified that he last observed signs of physical abuse in 1990. When questioned about Mr. Deihl's verbal abuse, William M. Deihl testified that Mr. Deihl constantly yelled at petitioner. No one else testified regarding any abuse of petitioner by Mr. Deihl.

Abuse is a genuine reason to grant relief from joint and several liability, and we are sensitive to the legal and emotional issues related thereto. However, we

cannot conclude on this record that petitioner did not question the treatment of items reported on the joint returns for fear of Mr. Deihl's retaliation. We did not find petitioner's testimony credible or convincing. Petitioner provided no substantiation of the alleged abuse, such as a police incident report or a medical report. As corroborating evidence, petitioner introduced only the testimony of William M. Deihl,[26] which we do not find credible. In the absence of corroborating evidence, we are not required to accept petitioner's self-serving testimony. See Shea v. Commissioner, 112 T.C. 183, 189 (1999). Petitioner has failed to meet her burden of proving that she was a victim of abuse.

Petitioner has not satisfied the seventh threshold condition of Rev. Proc. 2003-61, supra. Consequently, we conclude that petitioner is not entitled to section 6015(f) relief from the parts of the 1997-99 tax liabilities attributable to her.

---

[26]Petitioner's son may have a personal interest in the result of this litigation. He may have received property from petitioner after Mr. Deihl's death for no consideration. In addition, he is employed by the successor in interest to KareMor, and the record does not disclose whether he has an ownership interest in the continuing companies or how he might have obtained that interest. In the absence of persuasive corroborating evidence, we are not required to accept the self-serving testimony of interested parties. See Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512 (1984); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.