T.C. Memo. 2012-288

UNITED STATES TAX COURT

GLENELL HENSON, JR., Petitioner AND STEPHANIE A. HENSON, Intervenor
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14304-10.                    Filed October 10, 2012.

<u>Ray Cody Mayo, Jr.</u>, for petitioner.

<u>W. Deryl Medlin</u>, for intervenor.

<u>Marshall R. Jones</u> and <u>John W. Sheffield III</u>, for respondent.

**[\*2]**      MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Pursuant to section 6015(e)(1),[1] petitioner seeks review of respondent's determination that he is not entitled to relief from joint and several liability under section 6015(f) with respect to his Federal income tax liability for 2003.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

Pursuant to section 6015(e)(4) and Rule 325, petitioner's former spouse, Stephanie Henson (intervenor), intervened as a party in this case to oppose his request for relief.  Petitioner resided in Louisiana at the time he filed the petition.  Intervenor also resided in Louisiana at the time she filed the notice of intervention.

I.      <u>Petitioner's Background</u>

Petitioner attended three years of college at Louisiana State University (LSU) in Baton Rouge, Louisiana.[2]  He developed a successful career as an

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  The record is unclear as to whether petitioner received a degree from

(continued...)

**[*3]** engineer with Kansas City Southern Railroad (KCS Railroad) in Shreveport, Louisiana, rising in the ranks to upper level management. In 2003 he had an annual salary of approximately $60,000. By 2007 he was grossing around $140,000 as one of three supervisors managing KCS Railroad's Shreveport operations. KCS Railroad withheld Federal income tax from his wages.[3]

II.     Intervenor's Background

Intervenor received a bachelor of science degree from LSU in Baton Rouge, Louisiana, and a medical degree from LSU Medical Center in Shreveport, Louisiana. Following medical school, she entered a three-year residency program in pediatrics at LSU Medical Center. She was an employee whose wages were reported on Form W-2, Wage and Tax Statement, during her residency. After completing her residency in mid-1998, she became an independent contractor with a hospital, Willis Knighton Medical Center. The hospital provided her with a Form 1099-MISC, Miscellaneous Income, that reported that she had received nonemployee compensation, but the hospital did not withhold taxes from her

---

[2](...continued)
LSU.

[3] Petitioner believes that the withholding each year during the term of his marriage was sufficient to cover his Federal income tax liability. He is not asking the Court for relief from joint and several liability for any unpaid tax liability attributable to his own income.

[*4] income.  In 2002 she began her own medical practice.  On the recommendation of another doctor, she hired a local attorney to form Henson Pediatric Health Care (HPHC).

HPHC is organized as a limited liability company under State law and is disregarded for Federal income tax purposes.  From 2002 until 2008 HPHC employed a nurse, a medical assistant, and a receptionist.  HPHC withheld Federal income tax from their wages.  Intervenor was not listed as an employee of HPHC during this time and consequently did not have Federal income tax withheld from her income.[4]  At the end of 2008, on the advice of an Internal Revenue Service (IRS) agent, intervenor added herself to the employee roster and HPHC began withholding tax from her wages.[5]

III.    Petitioner's Relationship With Intervenor

Petitioner and intervenor first met in 1988 on a date arranged by their friends.  They got married in 1998 and had two children together, a son and a

---

[4]  Apart from 2003, in which intervenor reported income of $105,376 on Schedule C, Profit or Loss From Business, the record does not reflect her income for any other year.

[5]  Intervenor testified that she has not filed tax returns for 2008, 2009, and 2010 because they are extensive and expensive to prepare.  She does not know whether the wage withholding is sufficient to cover her Federal income tax liabilities.

[*5] daughter.  They lived a fairly normal lifestyle together, but their marriage was rocky.  Petitioner had on several occasions struck intervenor over disagreements on marital issues.[6]  In February 2008 the marriage began to fall apart.  The then vice president of KCS Railroad offered petitioner an executive position at the company's headquarters in Kansas City.[7]  The position came with one major drawback-- petitioner would have to leave Shreveport.  Intervenor's medical practice was based in Shreveport, and she refused to start her practice over.

The tension between petitioner and intervenor built up over the following months and erupted in a major altercation one Saturday evening in November 2008.  Petitioner was arrested the following day on battery charges.  On November 16, 2008, petitioner and intervenor separated.  Soon thereafter, petitioner called the then vice president of KCS Railroad and rejected the February job offer,[8] opting to stay in Shreveport to work things out with intervenor.  That never happened.

---

[6] Petitioner admitted to hitting intervenor in a "couple of incidents".

[7] While the record is unclear as to the details of the executive position, petitioner testified that KCS Railroad was going to make him a millionaire.

[8] Petitioner's position with KCS Railroad in Shreveport was transferred to Kansas City; petitioner accepted a lower level position with a combined salary, bonus, and retirement pay cut of $101,000.

**[\*6]** Petitioner and intervenor were divorced on July 30, 2009. The divorce decree conferred joint custody of the children to petitioner and intervenor but did not provide for payment of alimony or child support or contain any provision regarding payment of Federal income tax liabilities. There was no property settlement. In August 2010 petitioner and intervenor's home went into foreclosure. Petitioner voluntarily relinquished his interest in the home to intervenor, who refinanced the home in her name only. In September 2010 petitioner accepted a new position with KCS Railroad and moved to Overland Park, Kansas, where he currently resides.[9] Intervenor continues to operate her medical practice in Shreveport, Louisiana.

IV.    Control of Financial Matters

    A.    The Bank Accounts

Petitioner and intervenor shared a personal joint checking account (joint account). Petitioner's salary from KCS Railroad was directly deposited into the joint account. He and intervenor at all times during their marriage had full and uninterrupted access to the joint account.

---

[9] Overland Park is just outside Kansas City, where KCS Railroad is headquartered. The record does not reflect petitioner's current position or salary--it is unclear whether this is the same position he had earlier turned down.

**[*7]**    Intervenor had separate business accounts[10] and would periodically transfer money from these accounts to the joint account.  The transfers generally occurred on a Wednesday, the same day that Medicaid direct-deposited reimbursement claims from HPHC into the business accounts.  Intervenor gave petitioner a debit card for the business accounts--the same debit card that she gave to her medical assistant.[11]

Petitioner was authorized to write checks on the business accounts, but he chose not to write a single check, nor did he use the debit card even once.  Bank statements for the business accounts were delivered to HPHC; intervenor would later bring them to the home.  Petitioner reviewed the check registers and bank statements only at the time the tax returns were prepared.  He had no control over the billing, accounting, or payroll functions of HPHC and the corresponding deposits into the business accounts.  Intervenor determined the amounts and frequency of the transfers from the business accounts to the joint account.

---

[10]   Intervenor had a business checking account and a separate payroll account. The record does not reflect any meaningful differences between the two accounts. All references to business accounts include both accounts.

[11]   The medical assistant also served as the office manager and used the card to buy supplies.

**[*8]**  B.     The Household Bills

Each month petitioner and intervenor gathered all of the bills and placed them in a stack.  They jointly decided which bills to pay and jointly handled writing the checks and mailing the envelopes.  In addition to recurring expenses for utilities and household purchases, they had two big-ticket items:  a home mortgage with a monthly payment of $3,100 and a note on the truck intervenor used with a monthly payment of $800.[12]  They made all of the important money decisions together.

C.     The Tax Returns

Both petitioner and intervenor participated in the preparation of their tax returns.[13]  Generally, they created initial drafts of tax returns on their laptop computer using TurboTax software.  They reviewed the drafts together and took the drafts and other supporting documents to an accountant.[14]  They later met with

---

[12]  Petitioner was released from liability on the home mortgage when intervenor refinanced the home in her name.  It is unclear whether he remains liable on the truck note.

[13]  We cannot determine from the record their relative contributions, nor can we determine whether the returns for every year were prepared in the same manner.

[14]  Petitioner and intervenor changed accountants several times during their marriage.

**[*9]** the accountant at his office to discuss their returns. They both signed the final completed tax returns. They never completed the tax preparation in time to file timely returns, nor did they ever pay in full the tax shown due on the returns.

V.  A History of Tax Noncompliance

Petitioner and intervenor's history of tax noncompliance dates back to the early years of their marriage.[15] They filed their joint 2000 tax return late, on June 17, 2002, reporting a tax liability of $43,950, but apart from wage withholding of $8,339 on petitioner's salary, they failed to pay the tax shown due. They filed their joint 2001 tax return late, on July 8, 2002, reporting a tax liability of $37,635, but apart from wage withholding of $8,593 on petitioner's salary, they failed to pay the tax shown due. They filed their joint 2002 return late, on November 24, 2003, reporting a tax liability of $18,097, but apart from wage withholding of $8,172 on petitioner's salary, they once again failed to pay the tax shown due.

Petitioner and intervenor began to receive letters and collection notices from the IRS[16] and eventually realized that their tax problems would not take care of

---

[15] We cannot determine from the record whether petitioner and intervenor timely filed their 1998 or 1999 tax return. They presumably have unpaid tax liabilities attributable to these years, which were included in petitioner's request for relief from joint and several liability.

[16] The record reflects that they received notices of intent to levy on

(continued...)

[*10] themselves.  They talked it over and decided to meet with the IRS.  Petitioner initially met with Kayla Lettow, a revenue officer with respondent's collections department in Shreveport, and later he and intervenor had a joint meeting with Revenue Officer Lettow.  On February 11, 2005, petitioner and intervenor entered into an installment agreement under which they would make monthly payments of $1,700 towards their tax liabilities.

By the end of 2005 petitioner and intervenor had yet to file their 2003 tax return; and apart from wage withholding on petitioner's salary, they had made no payments towards their 2003 tax liability.  On March 13, 2006, respondent prepared a substitute for return for petitioner's 2003 tax year using married filing separately status on the basis of information returns filed by KCS Railroad.  On June 12, 2006, respondent mailed petitioner a notice of deficiency showing a tax liability of $10,191 and a withholding credit of $7,234 and determining a deficiency of $2,957, plus interest and penalties.[17]

---

[16](...continued)
September 30, 2002, and October 25, 2004.

[17]  The substitute for return and the notice of deficiency were in petitioner's name only; there is no evidence in the record that any substitute for return was prepared for intervenor.

[*11]  On September 15, 2006, petitioner filed a petition with the Court for redetermination of the deficiency.  Petitioner's case was dismissed on February 4, 2008, on the Court's order granting respondent's motion to dismiss for lack of prosecution.  On March 3, 2008, petitioner and intervenor filed their 2003 tax return late.  They continued to elect joint filing status.  They reported income of $166,571 and a tax liability of $34,130 on the return; but apart from the $7,234 of wage withholding on petitioner's salary, they failed to pay the tax shown due.

On March 24, 2008, petitioner and intervenor were no longer in installment agreement status.[18]  Sometime thereafter, the IRS began garnishing petitioner's wages.  For eight months the IRS garnished his entire salary except for $779 each month.

Petitioner and intervenor failed to comply with the Federal income tax laws for most of the remaining years of their marriage.  They filed their joint 2004, 2005, 2006, and 2007 returns late; and apart from a few inadequate payments

---

[18]  While no explanation for this change was provided to the Court, petitioner testified that he and intervenor continued to make payments to the IRS until they separated in November 2008.

**[*12]** intervenor made in 2004 and 2005[19] and petitioner's wage withholding each year, they failed to pay the taxes shown due on the returns.

VI.     Request for Innocent Spouse Relief

On March 6, 2009, petitioner filed with the IRS Form 8857, Request for Innocent Spouse Relief. Petitioner's request covered 1998 to 2007. On August 10, 2009, the IRS sent intervenor Letter 3284C, inviting her to respond to petitioner's request. She responded to the IRS by submitting a completed Form 12508, Questionnaire for Non-Requesting Spouse, objecting to petitioner's request. On May 20, 2010, respondent sent petitioner Letter 4475C, Final Determination, denying his request for innocent spouse relief. On June 22, 2010, petitioner filed a timely petition with the Court seeking review of respondent's determination that he is not entitled to relief from joint and several liability under section 6015(f) with respect to his Federal income tax liability for 2003 only.[20]

---

[19] Intervenor made three estimated tax payments of $5,000 in 2004, a miscellaneous payment of $5,000 in early 2005 that was credited to 2004, and one estimated tax payment of $5,000 in 2005.

[20] Respondent denied petitioner's request for innocent spouse relief for all years. The final determination for 2003 stated that petitioner did not show that it would be unfair to hold him responsible--he had reason to know that the tax liability for 2003 would not be paid, and the documentation he provided did not prove economic hardship. The final determination for the other years was not introduced into evidence. Petitioner's counsel asserted in his opening statement that the other

(continued...)

**[*13]**                                    OPINION

In general, a spouse who files a joint Federal income tax return is jointly and

severally liable for the entire tax liability.  Sec. 6013(d)(3).  However, a spouse may

be relieved from joint and several liability under section 6015(f) if:  (1) taking into

account all the facts and circumstances, it would be inequitable to hold him liable

for any unpaid tax; and (2) relief is not available to the spouse under section 6015(b)

or (c).[21]  The Commissioner has published revenue procedures listing the factors the

Commissioner normally considers in determining whether section 6015(f) relief

should be granted.  See Rev. Proc. 2003-61, 2003-2 C.B. 296, superseding Rev.

Proc. 2000-15, 2000-1 C.B. 447.  We consider these factors in the light of the

attendant facts and circumstances, but we are not bound by them.  See Sriram v.

Commissioner, T.C. Memo. 2012-91.

In determining whether petitioner is entitled to section 6015(f) relief we

apply a de novo standard of review as well as a de novo scope of review.  See

---

[20](...continued)
years are not before the Court "because of the Lantz case [discussed infra] and the timing of the collection" and that "there is a good chance that the prevailing party in this case, would ultimately prevail in what the other years [sic], after that Lantz issue was resolved with the Government".

[21]  The parties all agree that petitioner is not eligible for relief under sec. 6015(b) or (c).

[*14] Porter v. Commissioner, 132 T.C. 203 (2009) (Porter II); Porter v. Commissioner, 130 T.C. 115 (2008) (Porter I). Petitioner bears the burden of proving that he is entitled to relief. See Rule 142(a); Alt v. Commissioner, 119 T.C. 306, 311 (2002), aff'd, 101 Fed. Appx. 34 (6th Cir. 2004).

A.    Threshold Conditions for Granting Relief

In order for the Commissioner to determine that a taxpayer is eligible for section 6015(f) relief, the requesting spouse must satisfy the following threshold conditions:  (1) he filed a joint return for the taxable year for which he seeks relief; (2) relief is not available to him under section 6015(b) or (c); (3) no assets were transferred between the spouses as part of a fraudulent scheme by the spouses; (4) the nonrequesting spouse did not transfer disqualified assets to him; (5) he did not file or fail to file the returns with fraudulent intent; and (6) with enumerated exceptions, the income tax liability from which he seeks relief is attributable to an item of the nonrequesting spouse.[22]  Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at

_____

[22] Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. 296, 297-298, also lists a seventh threshold condition:  "The requesting spouse applies for relief no later than two years after the date of the Service's first collection activity after July 22, 1998, with respect to the requesting spouse."  In Lantz v. Commissioner, 132 T.C. 131 (2009), rev'd, 607 F.3d 479 (7th Cir. 2010), we held that the two-year deadline imposed by sec. 1.6015-5(b)(1), Income Tax Regs., is an invalid interpretation of sec. 6015(f).  After the U.S. Court of Appeals for the Seventh Circuit reversed Lantz, we reconsidered the matter but did not change our position.  See Hall v.
(continued...)

**[\*15]** 297-298.  Respondent concedes that petitioner has met all of the threshold

conditions.

B.      Safe Harbor:  Circumstances Under Which Relief Is Ordinarily Granted

When the threshold conditions have been met, the Commissioner will

ordinarily grant relief with respect to an underpayment of tax if the requesting

spouse meets the requirements set forth under Rev. Proc. 2003-61, sec. 4.02, 2003-

2 C.B. at 298. To qualify for relief under Rev. Proc. 2003-61, sec. 4.02, all of the

following elements must be satisfied:  (1) on the date of the request for relief the

requesting spouse is no longer married to, or is legally separated from, the

nonrequesting spouse, or has not been a member of the same household as the

nonrequesting spouse at any time during the 12-month period ending on the date of

the request for relief; (2) on the date the requesting spouse signed the return he had

no knowledge or reason to know that the nonrequesting spouse would not pay the

income tax liability; and (3) the requesting spouse will suffer economic hardship if

relief is not granted.

---

[22](...continued)
Commissioner, 135 T.C. 374 (2010).  In Notice 2011-70, 2011-32 I.R.B. 135, the
IRS changed its position and will now consider requests for equitable relief under
sec. 6015(f) if the period of limitation on collection of tax provided by sec. 6502 or
the period of limitation on credits or refunds provided in sec. 6511 remains open for
the tax years at issue.

**[*16]** Petitioner contends in his opening brief that he meets all of the safe harbor provisions of Rev. Proc. 2003-61, sec. 4.02, but he concedes that the Court would have to take an "expanded view" of the hardship requirement. He further concedes that he has sufficient income to pay the 2003 tax liability over time. Petitioner argues that "the controversy is bigger than the year at issue" and that we should consider the total unpaid tax liabilities in the Form 8857--an amount exceeding $500,000.[23]

Petitioner bears the burden of proving that he will suffer economic hardship if we do not grant him relief from joint and several liability. See Rule 142(a); Alt v. Commissioner, 119 T.C. at 311. A requesting spouse suffers economic hardship if paying the tax liability would prevent him from paying his reasonable basic living expenses.[24] Alioto v. Commissioner, T.C. Memo. 2008-185; Butner v.

---

[23] In the light of petitioner's argument, we do not view his statement that he has sufficient wherewithal to pay the 2003 tax liability as a concession that he fails to satisfy the hardship requirement.

[24] In determining a reasonable amount for basic living expenses, the Commissioner shall consider information provided by the taxpayer, including: (1) the taxpayer's age, employment status and history, ability to earn, number of dependents, and status as a dependent; (2) the amount reasonably necessary for food, clothing, housing, utilities, medical expenses, transportation, child support, and other necessities; (3) the cost of living in the geographical area in which the taxpayer lives; (4) the amount of property available to pay the taxpayer's expenses; (5) any extraordinary expenses, including educational expenses; and (6) any other
(continued...)

[*17] Commissioner, T.C. Memo. 2007-136; sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs.; Rev. Proc. 2003-61, sec. 4.02(1)(c), 4.03(2)(a)(ii), 2003-2 C.B. at 298. A hypothetical hardship is insufficient to justify relief. Pullins v. Commissioner, 136 T.C. 432, 446 (2011). Petitioner must demonstrate that imposing joint and several liability is "'inequitable in present terms', see Von Kalinowski v. Commissioner, T.C. Memo. 2001-21, and poses a present economic hardship", see Pullins v. Commissioner, 136 T.C. at 446. We have "consistently looked beyond the taxable year at issue to apply subsection (f)", Hall v. Commissioner, 135 T.C. 374, 380 (2010), and we evaluate petitioner's financial situation and prospects as of the time of trial, see Pullins v. Commissioner, 136 T.C. at 446-447.

Petitioner's financial situation fluctuated wildly in the years leading up to the trial. Petitioner earned approximately $140,000 in 2007 as a supervisor with KCS Railroad. In late 2008 he took a voluntary demotion to a lower level position with KCS Railroad and a commensurate pay cut of $101,000.[25] In 2009 he reported on the Form 8857 a salary of $6,666.67 per month ($80,000 per year).

---

[24](...continued)
factor that the taxpayer claims bears on economic hardship and brings to the Commissioner's attention. Sec. 301.6343-1(b)(4)(ii), Proced. & Admin. Regs.

[25] The record does not reflect his exact salary after the pay cut.

**[*18]** On this same form he reported monthly expenses of $1,931.63, leaving him with $4,735.04 of disposable income per month ($56,820.48 per year). In 2010 he was relieved of a $3,100 monthly mortgage liability in the aftermath of the divorce. That same year he received a promotion with KCS Railroad and moved near their Kansas City headquarters.

Petitioner did not introduce into the record any evidence as to his financial situation at the time of the trial. We cannot determine his present income and expenses nor his present solvency.[26] Petitioner's divorce judgment does not obligate him to pay alimony or child support. He has years of experience with KCS Railroad and the prospect of further career advancement.

Taking into account the foregoing, we find that petitioner has at most advanced an argument for a hypothetical hardship and has not met his burden of proving a present economic hardship. His monthly income greatly exceeded his monthly expenses two years before trial, and his present disposable monthly income and financial solvency are mere speculation. We cannot say that denying petitioner's request for relief from joint and several liability for 2003 would cause him to be unable to pay his basic reasonable living expenses. See Pullins v.

---

[26] The record does not reflect petitioner's assets or liabilities, other than the tax liabilities attributable to the years not at issue.

[*19] Commissioner, 136 T.C. at 447 (no economic hardship despite the taxpayer's disability and modest income where her household had "a monthly budget surplus and some ability to pay the tax debt" and she introduced no evidence of her assets at trial); Alt v. Commissioner, 119 T.C. at 314 (no economic hardship in paying tax liabilities exceeding $1 million where the taxpayer and her spouse had a combined salary exceeding $150,000); Karam v. Commissioner, T.C. Memo. 2011-230 (no economic hardship where the taxpayer could meet her basic living expenses while making periodic payments towards her tax liabilities); Pugsley v. Commissioner, T.C. Memo. 2010-255 (no economic hardship where the taxpayer had disposable income which she could use to make periodic payments towards her tax liabilities, even where she did not have the means to pay off her entire tax liability at once); Stolkin v. Commissioner, T.C. Memo. 2008-211 (no economic hardship where the taxpayer had disposable income to pay towards her tax liability; nonrequesting spouse's monthly income and expenses were irrelevant). Thus, petitioner is not entitled to relief under the criteria set forth in Rev. Proc. 2003-61, sec. 4.02.

C.    Factors Used To Determine Whether Relief Will Be Granted

Where, as here, a requesting spouse meets the threshold conditions but fails to qualify for relief under Rev. Proc. 2003-61, sec. 4.02, a determination to grant

[*20] relief may nevertheless be made under the criteria set forth in Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298-299. Rev. Proc. 2003-61, sec. 4.03, provides a nonexclusive list of factors the Commissioner will consider in making that determination: (1) whether the requesting spouse is separated or divorced from the nonrequesting spouse (marital status factor); (2) whether the requesting spouse would suffer economic hardship if not granted relief (economic hardship factor); (3) whether, at the time he or she signed the joint return, the requesting spouse knew or had reason to know that the nonrequesting spouse would not pay the income tax liability (knowledge factor); (4) whether the nonrequesting spouse has a legal obligation to pay the outstanding tax liability pursuant to a divorce decree or agreement (legal obligation factor); (5) whether the requesting spouse received a significant benefit from the unpaid income tax liability (significant benefit factor); and (6) whether the requesting spouse has made a good-faith effort to comply with the Federal income tax laws for the taxable years following the taxable year or years to which the request for relief relates (compliance factor).

The Commissioner may consider two other factors that, if present in a case, will weigh in favor of granting relief: (1) whether the nonrequesting spouse abused the requesting spouse (abuse factor); and (2) whether the requesting spouse

**[\*21]** was in poor mental or physical health at the time he or she signed the return or at the time he or she requested relief (mental or physical health factor). Id. sec. 4.03(2)(b), 2003-2 C.B. at 299. The absence of either factor will not weigh against granting relief. Id.

In making our determination under section 6015(f), we shall consider the factors set forth in Rev. Proc. 2003-61, sec. 4.03, and any other relevant factors. No single factor is determinative, and all factors shall be considered and weighed appropriately. See Pullins v. Commissioner, 136 T.C. at 448; Porter II, 132 T.C. at 214; Haigh v. Commissioner, T.C. Memo. 2009-140.

1.      Marital Status

Consideration is given to whether the requesting spouse is separated (whether legally separated or living apart) or divorced from the nonrequesting spouse. Rev. Proc. 2003-61, sec. 4.03(2)(a)(i), 2003-2 C.B. at 298. Petitioner and intervenor separated on November 16, 2008, and were living apart at the time petitioner filed the request for relief. Furthermore, they are now divorced and continue to live apart. Accordingly, the marital status factor weighs in favor of relief.

[*22] 2.      Economic Hardship

For the reasons previously discussed, petitioner did not prove that he would suffer economic hardship if we denied him relief from joint and several liability for 2003.  Accordingly, the economic hardship factor weighs against relief.

3.      Knowledge

A third factor is whether the requesting spouse knew or had reason to know that the nonrequesting spouse would not pay the tax liability.  In making the determination whether the requesting spouse had reason to know, consideration is given to, among other things:  (1) the requesting spouse's level of education; (2) the requesting spouse's degree of involvement in the activity generating the income tax liability; (3) the requesting spouse's involvement in business and household financial matters; (4) the requesting spouse's business or financial expertise; and (5) any lavish or unusual expenditures compared with past spending levels.  Id. sec. 4.03(2)(a)(iii)(C).

Before we consider and apply the above factor, we will comment on the testimonial credibility of the two witnesses, petitioner and intervenor.  In many respects their testimony is critical to our disposition of the issue involved herein.  Their testimony boils down to a "he said/she said" situation.

[*23] In Kropp v. Commissioner, T.C. Memo. 2000-148, we stated that "As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." In Diaz v. Commissioner, 58 T.C. 560, 564 (1972), we observed similarly that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, is the daily grist of judicial life. We are not required to accept testimony if it is improbable, unreasonable, or questionable. MacGuire v. Commissioner, 450 F.2d 1239, 1244-1245 (5th Cir. 1971), aff'g T.C. Memo. 1970-89.

We find that most of intervenor's testimony with respect to this factor was credible in material respects. Her testimony was relatively consistent and reasonably detailed. By contrast, we find that some of petitioner's testimony was not credible or was self-serving. At times, his testimony was internally inconsistent or inexplicably inane. We made our findings of fact accordingly.

Petitioner admitted at trial to knowing that there is a requirement to file a tax return and knowing that he and intervenor had not yet filed a tax return for 2003 by the time they filed their joint 2003 return late in 2008. He could remember neither why they were late in filing the 2003 return nor whether they had any discussions regarding the filing of the return. He admitted that at the time

**[*24]** he signed the 2003 return, he knew an amount was owed to the IRS. He further admitted that he failed to explain in the Form 8857 how he thought the amount of tax reported on the return would be paid. Nonetheless, he testified that he had no reason to believe that intervenor would not pay the tax liability shown on the 2003 return attributable to her income. He provided no explanation for his belief at trial but later argued on brief that he believed intervenor would pay the tax liability because "an installment agreement was in place and * * * [intervenor] had agreed to pay the liability at the time the return was filed. She continued to pay on an installment basis until * * * [we] became separated several years after the tax return for the year at issue was filed".[27]

On the other hand, intervenor testified that petitioner was "very aware of the amount due" and in fact "wanted to be in control of handling" it. She testified that petitioner realized that they needed help with their tax returns sometime between 2003 and 2006, at least two years before the filing of the 2003 return. She further testified that they did not have enough money to pay the full amount that was due to the IRS and thus petitioner was going to seek help from an attorney.

---

[27] There is no evidence in the record that intervenor had agreed to pay the 2003 tax liability. The installment agreement predated the filing of the 2003 tax return by more than three years.

[*25] Petitioner is a college-educated professional with years of experience working at KCS Railroad in both supervisory and nonsupervisory capacities. During his marriage he was involved in household financial decisions and contributed to the preparation of the tax returns, including the 2003 tax return. He had full and uninterrupted access to the mail and joint account. He also had access, although somewhat limited, to intervenor's business accounts. Moreover, he was keenly aware of his and intervenor's financial difficulties[28] and tax problems.[29]

We find that this cumulative evidence proves that petitioner knew there was a tax liability for 2003, knew that intervenor would have difficulty in paying the liability, and knew or had reason to know that intervenor would not pay the liability. We find petitioner's argument that the installment agreement gave him a basis to believe that intervenor would pay the 2003 tax liability unpersuasive. See Stolkin v. Commissioner, T.C. Memo. 2008-211 ("we have consistently found that a requesting spouse's knowledge of the couple's financial difficulties deprives the

---

[28] Petitioner testified that at least three times during the marriage their electricity was shut off because of nonpayment of the bill.

[29] Petitioner testified that he discussed with intervenor calling the IRS and trying "to get something set up" when he found out they had unpaid tax liabilities.

[*26] requesting spouse of reason to believe that his or her ex-spouse will pay the tax liability"). Accordingly, the knowledge factor weighs against relief.

4. Legal Obligation

If the nonrequesting spouse has a legal obligation to pay the outstanding tax liability pursuant to a divorce decree or agreement, this factor weighs in favor of relief unless "the requesting spouse knew or had reason to know, when entering into the divorce decree or agreement, that the nonrequesting spouse would not pay the income tax liability." Rev. Proc. 2003-61, sec. 4.03(2)(a)(iv). Where the divorce decree is silent, this factor is neutral. See Drayer v. Commissioner, T.C. Memo. 2010-257; Schultz v. Commissioner, T.C. Memo. 2010-233. Here, the divorce decree did not contain any provision regarding payment of the Federal income tax liabilities. Therefore, this factor is neutral.

5. Significant Benefit

This factor weighs against the requesting spouse if he received a significant benefit (beyond normal support) from the unpaid tax liability. Rev. Proc. 2003-61, sec. 4.02(a)(v), 2003-2 C.B. at 299. "A significant benefit is any benefit in excess of normal support." Sec. 1.6015-2(d), Income Tax Regs. A significant benefit may be direct or indirect. Id. "Normal" support is measured by the parties' circumstances. Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989).

**[*27]** Petitioner admitted that his approximately $60,000 salary ($5,000 per month) in 2003 was insufficient to pay all of his and intervenor's monthly bills. Intervenor credibly testified that petitioner's monthly take-home pay roughly paid the $3,100 mortgage. Simple math tells us that his take-home pay, after withholding for Federal income tax, State income tax, employment tax, and other miscellaneous amounts, may have been in the ballpark of the monthly mortgage payment. Hence, there is no doubt that petitioner benefited from intervenor's income.

However, in the light of the parties' circumstances, we find that the benefit was just normal support. The $3,100 mortgage payments on their home are not considered to generate a "significant benefit". See Pullins v. Commissioner, 136 T.C. at 452. Petitioner and intervenor did not have any unusual or lavish expenses. See Estate of Krock v. Commissioner, 93 T.C. at 679. Petitioner testified that they were not living "the high life" and had "just normal living bills". Intervenor testified that they paid the monthly bills with what they had and there was never a time when they were flush with cash and did not have to worry about monthly expenses.

In Butner v. Commissioner, T.C. Memo. 2007-136, we stated that "we consider the lack of significant benefit by the taxpayer seeking relief from joint

[*28] and several liability as a factor that favors granting relief under section 6015(f)." See also Bland v. Commissioner, T.C. Memo. 2011-8; DeMattos v. Commissioner, T.C. Memo. 2010-110. Accordingly, this factor weighs in favor of granting relief.

6. Compliance

The inquiry under this factor is whether a taxpayer has made a good-faith effort to comply with the Federal income tax laws in the taxable years following the year or years to which the request for relief relates. Rev. Proc. 2003-61, sec. 4.03(2)(a)(vi). Petitioner's request for relief covers the years 1998 to 2007, and thus we examine his compliance for the years after 2007.[30] Petitioner's counsel asserted in his opening statement that petitioner has "paid his taxes, like he always has" since his marriage ended and similarly argued on brief that petitioner "has paid all the liabilities for taxes since he separated from his wife". However, we have combed through the record and cannot find one scintilla of evidence that supports his contentions. We have long held that "[a]ssertions in opening statements, in arguments, or in briefs are not evidence, and, while helpful where

[30] As of the May 2011 trial, petitioner's 2008 and 2009 Federal income tax returns would have already been due. The 2010 return would not yet have been due if he had requested an extension of time to file; however, the time to pay the tax liability would not have been extended.

[*29] there is sufficient evidence in support of the contentions made, cannot be taken to supply evidence which is lacking." Kennedy v. Commissioner, T.C. Memo. 1958-139; see also Norton v. Commissioner, T.C. Memo. 1970-279, aff'd, 474 F.2d 608 (9th Cir. 1973). Accordingly, this factor is neutral. See Akopian v. Commissioner, T.C. Memo. 2011-237 (finding that the compliance factor was neutral because of the lack of evidence); Thomassen v. Commissioner, T.C. Memo. 2011-88 (same).

7. Abuse

Abuse by the nonrequesting spouse favors relief. Rev. Proc. 2003-61, sec. 4.03(2)(b)(i). Claims of abuse require substantiation or specificity in allegations. See Knorr v. Commissioner, T.C. Memo. 2004-212. Petitioner did not allege that he was abused by intervenor. Therefore, this factor is neutral. See Rev. Proc. 2003-61, sec. 4.03(2)(b).

8. Mental or Physical Health

There is no evidence that petitioner was in poor mental or physical health at any relevant time. Thus, this factor is neutral.

D. Notice 2012-8

After the trial the Commissioner issued Notice 2012-8, 2012-4 I.R.B. 309, on January 5, 2012, announcing that a proposed revenue procedure updating Rev.

**[\*30]** Proc. 2003-61, supra, will be forthcoming.  That proposed revenue procedure, if finalized, will revise the factors that the IRS will use to evaluate requests for equitable relief under section 6015(f).  Petitioner filed a motion to supplement his opening brief, which neither respondent nor intervenor objected to and which the Court granted.  He argues that Notice 2012-8, supra, should control to the extent that it clarifies Rev. Proc. 2003-61, supra.

In Sriram v. Commissioner, T.C. Memo. 2012-91, slip op. at 9 n.7, we stated that we would "continue to apply the factors in Rev. Proc. 2003-61, 2003-2 C.B. 296, in view of the fact that the proposed revenue procedure is not final and because the comment period under the notice only recently closed."  See also Yosinski v. Commissioner, T.C. Memo. 2012-195 (continuing to apply Rev. Proc. 2003-61, supra); Deihl v. Commissioner, T.C. Memo. 2012-176 (same).  In both Sriram and Deihl we called attention to the effect, if any, of a revised factor only to the extent we deemed it necessary for clarity, as our holding did not turn on any single factor as revised in the proposed revenue procedure.  We have carefully considered petitioner's arguments and likewise conclude that the outcome in this case would not change under the proposed revenue procedure.[31]

---

[31] Petitioner argues that under the proposed revenue procedure even though he "may have reason to know that the intervenor was not paying the tax when due",

(continued...)

**[*31]** E.     Conclusion

Petitioner bears the burden of proving that he is entitled to equitable relief. See Rule 142(a); Alt v. Commissioner, 119 T.C. at 311.  If we simply counted the number of factors for and against relief, petitioner would lose on the burden of proof--two factors weigh in favor of relief (marital status and significant benefit factors), two factors weigh against relief (economic hardship and knowledge factors), and four factors are neutral (legal obligation, compliance, abuse, and mental or physical health factors).[32]  See Hudgins v. Commissioner, T.C. Memo.

---

[31](...continued)
his lack of financial control mitigates his knowledge and independently favors relief. We find that he exercised a considerable amount of financial control in the household, and therefore the knowledge factor would continue to weigh against relief.  Petitioner argues that the proposed revenue procedure clarifies that his compliance with the tax laws after the marriage favors relief.  While we agree with his statement that compliance with the Federal income tax laws is a factor favoring relief, this factor would remain neutral because he offered no evidence of his compliance.  Finally, petitioner argues that under the proposed revenue procedure no one factor controls and relief may be appropriate even if the number of factors weighing against relief exceeds the number of factors weighing in favor.  We agree and do not believe that this would be a departure from our previous caselaw.  See Pullins v. Commissioner, 136 T.C. 432, 448 (2011) ("We analyze all relevant facts and circumstances, with all factors considered and appropriately weighted and no single factor determinative, in determining whether it is inequitable to hold a taxpayer liable for a joint tax liability" (Emphasis added.)).

[32] Under the proposed revenue procedure, petitioner would also lose if we counted the factors.  The economic hardship factor would be neutral because petitioner has not proven that he would suffer economic hardship if we denied him

(continued...)

[*32] 2012-260, at *39. In section 6015(f) cases, however, we do not simply count factors. Id. at *39-*40. Likewise, we are not bound by them. Id. at *14. The factors are guidelines we use in evaluating all of the relevant facts and circumstances to reach a conclusion. Id. Some of the most compelling facts in our analysis are the findings that petitioner: (1) exercised considerable control over the household finances and decisionmaking; (2) contributed to the preparation of the tax returns; (3) failed to comply with the Federal income tax laws for 1998 to 2007; (4) knew of the noncompliance beginning as early as 2002; and (5) persisted in a pattern of noncompliance through at least 2007. Taking into account the foregoing, and considering all the facts and circumstances, we find that petitioner has failed to persuade us that the equities weigh in his favor. Accordingly, we conclude that petitioner is not entitled to relief from joint and several liability under section 6015(f) for 2003.

We have considered all arguments made in reaching our decision and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

---

32(...continued)
relief. See Notice 2012-8, sec. 4.03(2)(b), 2012-4 I.R.B. 309. The significant benefit factor would also be neutral, as the evidence shows that neither spouse received a significant benefit from the unpaid tax liabilities. See id. sec. 4.03(2)(e). The other factors would not change. Therefore, one factor would weigh in favor of relief, one factor would weigh against relief, and six factors would be neutral.

[*33] To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.