T.C. Memo. 2015-124

UNITED STATES TAX COURT

ALBERT ARIAS AGUDELO, Petitioner, AND CECILIA ARIAS, Intervenor <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3088-13.                         Filed July 7, 2015.

Before 2010 P filed for unemployment benefits with the California Employment Development Department, which issued P biweekly checks during 2010 and reported to the Commissioner total 2010 payments to P of $10,320 and Federal income tax withheld of $114. P filed a joint Federal income tax return with his then wife, CA, for the 2010 tax year. P and CA did not report any income from unemployment benefits on that return. R mailed P and CA a notice of deficiency in which R determined a $1,692 tax deficiency arising from the unreported unemployment compensation income. P seeks relief from joint and several liability under I.R.C. sec. 6015.

Held: P is not entitled to relief from joint and several liability under I.R.C. sec. 6015(b), (c), or (f).

**[*2]**   Albert Arias Agudelo, pro se.

Cecilia Arias, pro se.

Cory H. Ellenson, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WHERRY, Judge:  On November 13, 2012, respondent mailed a notice of deficiency for the 2010 tax year to Albert Arias Agudelo and Cecilia Arias, who had timely filed a joint Federal income tax return for that year.  In the notice respondent determined unreported unemployment compensation income of $10,320 and a resulting Federal income tax deficiency of $1,692.  Mr. Agudelo filed a timely petition for redetermination of the deficiency on February 4, 2013, and on March 25, 2013, an amendment to petition in which he requested innocent spouse relief under section 6015.[1]  Ms. Arias filed a notice of intervention on May 28, 2013.

It is undisputed that checks for unemployment compensation were issued to Mr. Agudelo during 2010 and that he and Ms. Arias did not report this income on

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all amounts to the nearest dollar.

[*3] their 2010 joint return. We must decide whether Mr. Agudelo and/or Ms. Arias received the checks, and if so, whether Mr. Agudelo is entitled to relief from joint and several liability under section 6015.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.[2] Both Mr. Agudelo and Ms. Arias lived in California when Mr. Agudelo filed his petition. Ms. Arias still lived in California when she filed her notice of intervention.

Mr. Agudelo and Ms. Arias' Tax Reporting

Mr. Agudelo and Ms. Arias separated in January 2012 and, as of the time of trial, were in the process of divorcing. During 2010, however, they were married, and they timely filed a joint Federal income tax return for that year.

On their 2010 Form 1040, U.S. Individual Income Tax Return, Mr. Agudelo and Ms. Arias reported income of $14,400 from Mr. Agudelo's messenger business and $5,010 from Ms. Arias' sales business on Schedules C-EZ, Net Profit From Business. They did not report income from any other source. Their paid tax return preparer, Ruben Omar Guma Insurance Agency, computed total tax of $2,743, attributable entirely to self-employment tax, and total payments of $7,836,

_____

[2]At the beginning of the trial the parties submitted, and the Court filed, a first stipulation of facts signed by respondent's counsel, Mr. Agudelo, and Ms. Arias, together with 26 exhibits.

[*4] comprising an $800 making work pay credit, a $5,036 earned income credit, and a $2,000 additional child tax credit. They claimed an overpayment of $5,093 and requested a refund of the full amount. Both Mr. Agudelo and Ms. Arias signed their 2010 return.

Mr. Agudelo's Unemployment Compensation

Before 2010 Mr. Agudelo applied for unemployment compensation with the California Employment Development Department (EDD). During 2010 EDD issued checks to Mr. Agudelo biweekly. EDD reported to Respondent that it had paid $10,320 to Mr. Agudelo during 2010.

At trial Mr. Agudelo denied ever receiving or signing the checks, explaining that he did not have access to mail at the address where he and Ms. Arias lived during 2010; Ms. Arias contends, and the Court concludes, that she and Mr. Agudelo both had keys to the mailbox. Indeed, Mr. Agudelo and Ms. Arias, each under oath, offered dramatically different accounts of their marriage and--as is relevant to our analysis here--of the EDD checks' fate.[3] Mr. Agudelo claimed that

---

[3]Mr. Agudelo testified that Ms. Arias had "dominated" him financially, physically and emotionally abused him and their children, and threatened him with a knife. To support these allegations, Mr. Agudelo introduced police reports from 1997 and 2012, a restraining order entered against Ms. Arias on January 31, 2012, for the protection of Mr. Agudelo and their children, documents relating to a dispute between Mr. Agudelo and Ms. Arias with respect to real estate in

(continued...)

**[\*5]** he did not recall signing the EDD checks, that the signature on the back of the checks could not be his, and that Ms. Arias had taken the checks and used the money to pay for plastic surgery and a vehicle and to make a loan. Ms. Arias insisted that she never opened Mr. Agudelo's mail because he was "very aggressive" and that she had never seen the checks or even been aware that her then husband had filed for unemployment benefits.

---

[3](...continued)
Colombia, and various reports and other letters allegedly documenting Ms. Arias' abuse of their children and the children's resulting psychiatric care.

Ms. Arias testified that Mr. Agudelo had brought her to the United States from Colombia, had used false identity documents to bring people into the country, had required her to use a different name while in the United States, and had taken her identity documents, possibly to use in smuggling people across the border. To support her side of the story, Ms. Arias introduced, inter alia, a letter from a hearing officer at the office of the Los Angeles city attorney advising that a criminal complaint against Ms. Arias had been dropped after a hearing on October 23, 2012, and a declaration signed by Mr. Agudelo and filed with the California Superior Court stating that he did not give Ms. Arias notice of the hearing at which he obtained the restraining order.

During the trial Mr. Agudelo and Ms. Arias also vehemently disputed the status of their child custody battle and Ms. Arias' legal name.

Many of the documents Mr. Agudelo and Ms. Arias offered lack indicia of authenticity and embody little more than each party's own assertions, committed to writing. Moreover, for the most part, the documents themselves and the events recounted therein date from long before the 2010 tax year at issue, or from 2012, the year in which Mr. Agudelo and Ms. Arias separated. These exhibits have little probative value with respect to events that occurred during 2010 and before February 28, 2011, when Mr. Agudelo and Ms. Arias filed their 2010 tax return.

We are not a court of domestic relations and make no factual findings concerning these allegations.

**[\*6]** <u>Procedural History</u>

Respondent mailed Mr. Agudelo and Ms. Arias the notice of deficiency for their 2010 tax year on November 13, 2012.[4]  Respondent sent the notice to the address where Mr. Agudelo lived when he filed his petition timely on February 4, 2013.  In response to this Court's order on March 25, 2013, Mr. Agudelo filed an amendment to petition accompanied by a request to waive the filing fee.  In the amendment to petition he corrected various procedural and pleading errors and requested innocent spouse relief under section 6015.  After respondent served her with notice of Mr. Agudelo's request, Ms. Arias filed a notice of intervention on May 28, 2013.

Following Mr. Agudelo's amendment to his petition, respondent's counsel sent a copy of the administrative file to respondent's Centralized Cincinnati Innocent Spouse Operations (CCISO) unit.  Mr. Agudelo submitted a completed Form 8857, Request for Innocent Spouse Relief, to CCISO.  CCISO denied Mr. Agudelo's request under section 6015(b), (c), and (f).

Mr. Agudelo and Ms. Arias both appeared for the February 24, 2014, trial. They were the only witnesses who testified.

---

[4]Mr. Agudelo and Ms. Arias separated in January 2012, so it is unclear whether Ms. Arias received a copy of the notice or otherwise learned of it from Mr. Agudelo.

**[*7]**                                OPINION

Neither Mr. Agudelo in his petition nor Ms. Arias in her notice of intervention specifically disputed that Mr. Agudelo received unemployment compensation from EDD during 2010 or that this compensation was includible in their income for that year. Because the evidence at trial casts doubt on whether Mr. Agudelo and/or Ms. Arias had ever received the checks EDD mailed, after dispensing with one preliminary matter we will briefly analyze whether the aggregate amount of these checks was includible in their 2010 income before proceeding to Mr. Agudelo's innocent spouse claim.

I.     Adverse Presumption

At the close of trial, because a bank from which respondent had subpoenaed potentially highly probative records had not yet responded to the subpoenas, the Court held the record open. In a status report filed April 22, 2014, respondent's counsel advised that he had received the records and obtained Ms. Arias' signature on a supplemental statement of facts, but that he had not yet been able to speak with Mr. Agudelo, whom he had tried to contact by telephone and via letter. Respondent's counsel and Ms. Arias lodged a first supplemental stipulation of facts with exhibits on May 27, 2014. The exhibits purport to be internal records of EDD and bank records, including both statements and copies of canceled checks,

**[*8]** for bank accounts in Mr. Agudelo's and/or Ms. Arias' names. Because Mr. Agudelo did not execute the stipulation, neither it nor the attached exhibits are part of the formal evidentiary record.

Mr. Agudelo neither explained his objections to the stipulation and exhibits nor attempted to introduce other, similar evidence of his own. To the extent that he disputed some aspect of the exhibits attached to the stipulation, true and correct copies of his own bank account statements and of any canceled checks deposited into his accounts were within his possession. "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947). That presumption applies squarely to Mr. Agudelo, particularly to the extent that he bears the burdens of going forward with the evidence and of proof. See id. (noting that presumption "is especially true where * * * the party failing to produce the evidence has the burden of proof").

II.     Unreported Income

Generally, the Commissioner's determination of a taxpayer's tax liability is presumed correct, and the taxpayer bears the burden of proving the determination

**[\*9]** improper. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Because of the difficulty inherent in proving a negative, however, where the Commissioner determines that a taxpayer received unreported income, he "must offer some substantive evidence showing that the taxpayer received income from the charged activity" before he may rely upon the presumption of correctness. <u>Weimerskirch v. Commissioner</u>, 596 F.2d 358, 360 (9th Cir. 1979), <u>rev'g</u> 67 T.C. 672 (1977).[5] If the Commissioner provides "a minimal factual foundation" for his determination, the burden of proof shifts to the taxpayer. <u>Palmer v. United States</u>, 116 F.3d 1309, 1312 (9th Cir. 1997); <u>accord</u> <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 689 (1989). At this second stage, the taxpayer must endeavor to rebut the presumption of correctness "by establishing by a preponderance of the evidence that the deficiency determination is arbitrary or erroneous." <u>Rapp v. Commissioner</u>, 774 F.2d 932, 935 (9th Cir. 1985).

---

[5]This Court "follow[s] a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." <u>Golsen v. Commissioner</u>, 54 T.C. 742, 757 (1970), <u>aff'd</u>, 445 F.2d 985 (10th Cir. 1971). When he filed his petition, and when she filed her notice of intervention, Mr. Agudelo and Ms. Arias lived in California, a State within the jurisdiction of the Court of Appeals for the Ninth Circuit, so we will follow decisions of that court. <u>See</u> sec. 7482(b)(1)(A).

[*10] Unemployment compensation is generally includible in gross income.  See

sec. 85(a); sec. 1.85-1, Income Tax Regs.  Respondent introduced evidence

showing that EDD reported having paid Mr. Agudelo total 2010 unemployment

compensation of $10,320.  This evidence established the minimal factual

foundation required of respondent at the threshold stage and suffices to shift the

burden of proof to Mr. Agudelo.[6]

At trial Mr. Agudelo insisted that he did not recall signing the checks and

that Ms. Arias had taken the money.  If he never in fact received the funds EDD

sent, then these funds might not constitute income to him.  See Commissioner v.

Glenshaw Glass Co., 348 U.S. 426, 431 (1955) (explaining that a taxpayer

generally must have "complete dominion" over an "accession[] to wealth" for that

_____

[6]Sec. 6201(d) provides that, "if a taxpayer asserts a reasonable dispute with
respect to any item of income reported on an information return filed with the
Secretary * * * by a third party and the taxpayer has fully cooperated with the
Secretary * * * , the Secretary shall have the burden of producing reasonable and
probative information concerning such deficiency in addition to such information
return."  The key term in the foregoing sentence is "reasonable".  For the reasons
explained in the text, assuming arguendo that Mr. Agudelo's assertions may be
construed as disputing the information reported by EDD, the dispute so raised is
not a reasonable one.  See, e.g., Parker v. Commissioner, T.C. Memo. 2012-66,
103 T.C.M. (CCH) 1321, 1323 (2012) (finding sec. 6201(d) inapplicable where
the taxpayer offered "vague, evasive, and noncredible" testimony to the effect that
"he was uncertain or could not remember whether he had received the amounts
reported on most of the information returns and suggested, without any
corroborating evidence, that the unemployment compensation he received * * *
had been 'refunded'").

[*11] accession to clearly constitute gross income to the taxpayer). But Mr. Agudelo's testimony on this point was not credible and did not, in the absence of corroborating evidence, persuade the Court that he never received some or all of the EDD checks.

"The Tax Court is not * * * free to ignore * * * uncontroverted testimony" but "need not necessarily accept the uncontroverted testimony of the taxpayer" where such testimony is "almost wholly conclusory". Potts, Davis & Co. v. Commissioner, 431 F.2d 1222, 1225 (9th Cir. 1970), aff'g T.C. Memo. 1968-257. In unreported income cases such as this one, we and the Court of Appeals for the Ninth Circuit have generally found against the taxpayer when the evidence offered consists principally of the taxpayer's own testimony and that testimony is either vague and implausible or uncorroborated by other evidence. See, e.g., Delaney v. Commissioner, 743 F.2d 670, 672 (9th Cir. 1984), aff'g T.C. Memo. 1982-666; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), aff'g T.C. Memo. 1969-159; Parks v. Commissioner, 94 T.C. 654, 659 (1990).

Mr. Agudelo's testimony was vague, implausible, and uncorroborated. We conclude that he received $10,320 of unemployment compensation income in the 2010 tax year and that he and Ms. Arias should have reported that income on their return. We now to turn to his innocent spouse claim.

**[*12]** III.    <u>Innocent Spouse Relief</u>

As a general rule, married taxpayers who elect to file a joint Federal income tax return are jointly and severally liable for the entire tax due for that year.  Sec. 6013(a), (d)(3); <u>Porter v. Commissioner</u>, 132 T.C. 203, 206 (2009).  Nevertheless, a spouse who has filed a joint return may seek relief from joint and several liability under the procedures of section 6015.  Sec. 6015(a).  Section 6015 provides a taxpayer spouse with three possible alternatives:  (1) relief from joint and several liability under subsection (b), (2) liability allocation under subsection (c), and (3) if the taxpayer spouse does not qualify for relief under subsection (b) or (c), equitable relief under subsection (f).  The Secretary has discretion to grant equitable relief to a spouse who filed a joint return with an unpaid tax liability or a deficiency.  Sec. 6015(f); sec. 1.6015-4(a), Income Tax Regs.

Except as otherwise provided in section 6015, the taxpayer bears the burden of proving that he or she is entitled to section 6015 relief.  Rule 142(a); <u>Alt v. Commissioner</u>, 119 T.C. 306, 311 (2002), <u>aff'd</u>, 101 Fed. Appx. 34 (6th Cir. 2004).  Both the scope and standard of our review in section 6015 cases are de novo.  <u>Porter v. Commissioner</u>, 132 T.C. at 210.

Mr. Agudelo made only a generalized request for section 6015 relief without specifically citing subsections (b), (c), and/or (f) of that statute, so we will,

[*13] as respondent's CCISO did, evaluate his entitlement to relief under each alternative.

### A.     Relief Under Section 6015(b)

Section 6015(b) requires a taxpayer seeking relief from joint and several liability to satisfy five conditions:  (1) a joint return was filed for the taxable year, (2) there is an understatement of tax attributable to erroneous items of the taxpayer's spouse, (3) the taxpayer establishes that in signing the return, he or she did not know, and had no reason to know, that there was an understatement, (4) taking into account all facts and circumstances, it would be inequitable to hold the taxpayer liable for that year's deficiency in tax attributable to such understatement, and (5) the taxpayer timely elects relief under section 6015(b). Because these conditions are stated in the conjunctive, the taxpayer must satisfy all five in order to qualify for relief.  See Alt v. Commissioner, 119 T.C. at 313. Mr. Agudelo did file a joint return for 2010, but on the existing record, he plainly cannot satisfy at least two of the other conditions.

First, a taxpayer requesting innocent spouse relief under section 6015(b) must show that the understatement of tax is attributable to erroneous items of the nonrequesting spouse.  "An erroneous item is any item resulting in an understatement or deficiency in tax to the extent that such item is omitted from, or

**[*14]** improperly reported (including improperly characterized) on an individual income tax return." Sec. 1.6015-1(h)(4), Income Tax Regs. Generally, an erroneous item is attributed to the individual whose activities gave rise to the item. Id. para. (f)(1); see also sec. 1.6015-3(d)(2)(iii), Income Tax Regs. ("Erroneous items of income are allocated to the spouse who was the source of the income.").

The erroneous item here was unreported unemployment compensation income. Generally, unemployment compensation income is attributable to the individual to whom the compensation is payable. See, e.g., Work v. Commissioner, T.C. Memo. 2014-190, at *8-*9, *12. In this case, that individual would be Mr. Agudelo. His application to EDD for unemployment benefits gave rise to the income. Mr. Agudelo, as the applicant, was the beneficiary of its payments. Accordingly, we conclude that the erroneous item was attributable to Mr. Agudelo, not Ms. Arias, so he cannot satisfy section 6015(b)(1)(B).

Second, section 6015(b)(1)(C) requires the taxpayer spouse to establish that in signing the return, he or she did not know, and had no reason to know, that there was an understatement. "A taxpayer who signs a return is generally charged with constructive knowledge of its contents." Porter v. Commissioner, 132 T.C. at 211. If a taxpayer is aware of the circumstances that gave rise to the error--even if he or she is unaware of the tax consequences--then the taxpayer has reason to

[*15] know of it.  See id. at 212; see also sec. 1.6015-2(c), Income Tax. Regs. ("A requesting spouse has knowledge or reason to know of an understatement if he or she actually knew of the understatement, or if a reasonable person in similar circumstances would have known of the understatement.").

Mr. Agudelo signed the joint Federal income tax return from which his unemployment compensation income was omitted.  EDD issued unemployment compensation checks to him after he affirmatively applied for unemployment benefits.  Under the circumstances, we think Mr. Agudelo had, at the very least, reason to know that he had received unemployment compensation income and that this income did not appear on his tax return.  Accordingly, he cannot meet the third requirement of section 6015(b).

We need not decide whether equity considerations favor Mr. Agudelo, nor whether his request for relief was timely.  Because he does not meet the requirements of subsection (b)(1)(B) and (C), he does not qualify for relief under section 6015(b).

B.     Allocation of Liability Under Section 6015(c)

Under section 6015(c), a divorced or separated spouse may elect to limit liability for a deficiency on a joint return to the portion of the deficiency that is

**[\*16]** allocable to him or her under subsection (d).  The election may be filed at any time after the deficiency is "asserted" but not later than two years after the Secretary has begun collection activities.  Sec. 6015(c)(3)(B).  The electing individual:  (1) must no longer be married to or must be legally separated from the individual with whom the joint return was filed or (2) must not have been a member of the same household with the individual with whom the joint return was filed during the 12-month period before the election was filed.  Id. subpara. (A)(i).

Subject to certain limitations, any item giving rise to a deficiency on a joint return is generally allocated between the individuals filing the return in the same manner as it would have been if the individuals had filed separate returns.[7]  Sec. 6015(d)(3)(A).  "Erroneous items of income are allocated to the spouse who was the source of the income."  Sec. 1.6015-3(d)(2)(iii), Income Tax Regs.; see also

_____

[7]Sec. 6015(d)(3) provides for two exceptions to the general allocation rule.  An item otherwise allocable to the requesting spouse will be allocated to the nonrequesting spouse if (1) "the item gave rise to a tax benefit on the joint return to the" nonrequesting spouse, or (2) "the Secretary establishes that such allocation is appropriate due to fraud of one or both individuals."  Sec. 6015(d)(3)(B) and (C).  First, Mr. Agudelo has not shown that the omission of his unemployment compensation from the joint return gave rise to a tax benefit to Ms. Arias.  Omission of that income did lead the couple to claim a refund larger than that to which they were in fact entitled, but Ms. Arias disclaimed any knowledge of the account number provided for direct deposit on the joint return.  There is no evidence that she benefited from any refund.  Second, the Secretary has not alleged, much less established, fraud by Mr. Agudelo or Ms. Arias.

**[*17]** <u>Work v. Commissioner</u>, at *8-*9, *12 (allocating unemployment compensation income to the individual to whom the compensation income was payable). Mr. Agudelo, who applied for unemployment benefits from EDD and who was the beneficiary of its payments, was the source of the erroneous income item here. We need not determine whether Mr. Agudelo would otherwise qualify for allocation of the deficiency under section 6015(c) because, even if he so qualified, the entire deficiency would be allocated to him.

  C. <u>Relief Under Section 6015(f)</u>

  Section 6015(f) provides an alternative avenue for relief where relief is unavailable under both subsections (b) and (c) if, taking into account all the facts and circumstances, it would be inequitable to hold the requesting spouse liable for the unpaid tax or deficiency or any part thereof. <u>See</u> sec. 1.6015-4(a), Income Tax Regs.

  Section 6015(f) authorizes the Secretary under certain circumstances to grant relief "[u]nder procedures prescribed by the Secretary". For requests filed on or after September 16, 2013, and for requests pending in any Federal court on or after September 16, 2013, Rev. Proc. 2013-34, 2013-43 I.R.B. 397, lists the various factors the Commissioner will consider in determining eligibility for relief under section 6015(f). Because Mr. Agudelo's petition was pending on

**[*18]** September 16, 2013, although we are not bound by them, we will analyze his request under the reasonable guidelines in Rev. Proc. 2013-34, supra, to assist in ascertaining whether he satisfies the requirements for relief under section 6015(f). See, e.g., Pullins v. Commissioner, 136 T.C. 432, 438-439 (2011) (analyzing taxpayer's entitlement to section 6015(f) relief under Rev. Proc. 2003-61, 2003-2 C.B. 296, the predecessor revenue procedure to Rev. Proc. 2013-34, supra); Hall v. Commissioner, T.C. Memo. 2014-171, at *34-*42 (analyzing taxpayer's entitlement to section 6015(f) relief under Rev. Proc. 2013-34, supra).

Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. at 399-400, lists seven threshold conditions that a requesting spouse must satisfy to be eligible for relief. The seven conditions are stated in the conjunctive; a requesting spouse must satisfy all seven conditions before relief may be granted. Id. The first six of these conditions are: (1) the requesting spouse filed a joint return for the year for which relief is sought; (2) relief is not available to the requesting spouse under section 6015(b) or (c); (3) the claim for relief is timely filed; (4) no assets were transferred between the spouses as part of a fraudulent scheme; (5) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse; and (6) the requesting spouse did not knowingly participate in the filing of a fraudulent joint return. Id.

[*19] sec. 4.01(1)-(6). On the record before us, it appears that Mr. Agudelo satisfies these six conditions.

The seventh condition, however, presents an obstacle: Generally, the income tax liability from which the requesting spouse seeks relief must be attributable, either in full or in part, to an item of the nonrequesting spouse or an underpayment resulting from the nonrequesting spouse's income. See id. sec. 4.01(7). If the liability is partially attributable to the requesting spouse, relief may be considered for that portion of the liability attributable to the nonrequesting spouse. Id. As explained supra, the entire liability at issue here is attributable to Mr. Agudelo, not Ms. Arias.

Nevertheless, the Commissioner may still consider granting relief regardless of whether the understatement or deficiency is attributable to the requesting spouse if any of the following exceptions applies: (1) attribution solely due to operation of community property law; (2) nominal ownership; (3) misappropriation of funds; (4) abuse; or (5) fraud committed by the nonrequesting spouse. Id. Mr. Agudelo's evidence implicates the last three exceptions. We consider the misappropriation and fraud exceptions together.

The misappropriation of funds exception applies "[i]f the requesting spouse did not know, and had no reason to know, that funds intended for the payment of

[*20] tax were misappropriated by the nonrequesting spouse for the nonrequesting spouse's benefit, * * * to the extent that the funds intended for the payment of tax were taken by the nonrequesting spouse." Id. sec. 4.01(7)(c). The fraud exception applies "if the requesting spouse establishes that the non-requesting spouse's fraud is the reason for the erroneous item." Id. sec. 4.01(7)(e), 2013-43 I.R.B. at 400. A requesting spouse might properly invoke this exception where, for example, the nonrequesting spouse fraudulently accesses the requesting spouse's brokerage account to sell stock that the requesting spouse inherited, then deposits the sale proceeds into a separate bank account to which the requesting spouse lacks access, and the couple fails to report the sale on their joint return for that year. See id.

Mr. Agudelo asserted that Ms. Arias had taken his unemployment compensation checks and used them to pay for plastic surgery and a vehicle and to make a loan. He presented no credible corroborative evidence,[8] and his assertion,

---

[8]Mr. Agudelo introduced: (1) a photocopied advertisement for a cosmetic surgery center apparently published in a Spanish-language magazine on November 7, 2009, and a handwritten note listing prices for two cosmetic procedures to which he had added the notation "Around of [sic] 2009 year", (2) a note written by Mr. Agudelo in which he states that in 2005 Ms. Arias purchased a 2003 Ford Escape for $6,500 and that the vehicle is "paid off", and (3) a Spanish-language document memorializing a $10,000 loan from Ms. Arias to "Jose Israel Flores" that was notarized on September 3, 2009. He also alleged that Ms. Arias had purchased "$16,000 worth of jewels". This evidence does not corroborate Mr. Agudelo's allegation of misappropriation. He created the note regarding the Ford

(continued...)

**[\*21]** in isolation, is unpersuasive. See, e.g., Shea v. Commissioner, 112 T.C. 183, 189 (1999) ("As we have stated many times before, this Court is not bound to accept a taxpayer's self-serving, unverified, and undocumented testimony."). With respect to the misappropriation exception, Mr. Agudelo offered no testimony or other evidence that he intended to use his unemployment compensation to satisfy his tax liability. With respect to the fraud exception, the only evidence of fraud in the record is his self-serving testimony. Accordingly, he has not shown that either the misappropriation exception or the fraud exception applies to this case.

The abuse exception applies "[if] the requesting spouse establishes that he * * * was the victim of abuse prior to the time the return was filed, and that, as a result of prior abuse, the requesting spouse was not able to challenge the treatment of any items on the return * * * for fear of the nonrequesting spouse's retaliation". Rev. Proc. 2013-34, sec. 4.01(7)(d). Mr. Agudelo asserted that Ms. Arias

---

[8](...continued)
Escape; and the handwritten note regarding cosmetic surgery, which he submitted for inclusion in the stipulated exhibits, is of unknown origin. The cosmetic surgery advertisement by itself tends to show only that such surgery was available in the marketplace in late 2009, and all three exhibits relate to expenditures that allegedly occurred in 2009 or earlier. Ms. Arias could not have used funds from checks issued by EDD during 2010 to pay at the time of the event for personal expenses in 2009. There is no evidence in the record that 2010 funds were used in 2010 to pay off debts arising from the alleged items in 2009.

**[\*22]** emotionally and physically abused him and their children, controlled and excluded him from their household finances, and generally took advantage of his age and naivete.

This Court does not treat such serious allegations lightly, but neither will we accept a taxpayer's uncorroborated or nonspecific abuse claims at face value. See, e.g., Pullins v. Commissioner, 136 T.C. at 454; Johnson v. Commissioner, T. C. Memo. 2014-240, at *13-*14. Mr. Agudelo did attempt to corroborate his assertions with documentary evidence, but we can give that evidence little weight.

He proved, for example, that he had obtained a restraining order against Ms. Arias in Los Angeles Superior Court, but she proved that he did so at a hearing that she did not attend and in which she had no opportunity to participate because he did not give her notice. On cross-examination by Ms. Arias, who had argued during her opening statement that Mr. Agudelo was a paralegal who used his knowledge of the legal system to harass and falsely accuse her, Mr. Agudelo acknowledged having "handled very few cases * * * in Los Angeles Superior Court" in "2006 or 2007" when his "brain still had some * * * oxygen".

He showed that Ms. Arias was arrested for spousal abuse in July 1997 and that in January 2012 he filed a police report claiming further abuse had occurred in June 2011, after he and Ms. Arias had filed their 2010 income tax return. These

[*23] two alleged incidents, 14 years apart, do not establish a pattern, and Ms. Arias' 1997 arrest, while "prior to" the date on which the return was filed, is too remote from the 2011 filing date for us to infer an abusive relationship in the absence of testimony or other evidence linking the two events. Moreover, a letter written by a hearing officer for the Los Angeles city attorney and introduced by Ms. Arias indicates that in October 2012 the City declined to pursue at least one of Mr. Agudelo's abuse allegations because Mr. Agudelo threatened Ms. Arias at the hearing and because the hearing officer found credible her allegations of harassment by Mr. Agudelo.[9] The Court also observed the physical conditions and

---

[9]Mr. Agudelo also introduced, inter alia, a typewritten page that appears to have been taken from a California Children and Family Services Division file or at least designed to so appear. The page, which consists of several paragraphs in different fonts and typefaces, recounts allegations of child abuse and neglect made against both Mr. Agudelo and Ms. Arias by unnamed referral sources on various occasions from 2000 to 2012. It provides no insight as to whether Ms. Arias abused Mr. Agudelo before they filed their 2010 income tax return, or whether Mr. Agudelo refrained from insisting that his unemployment compensation be reported on that return because he feared retaliation by Ms. Arias. Although Rev. Proc. 2013-34, sec. 4.03(2)(c)(iv), 2013-43 I.R.B. 399, 402, notes that "[d]epending on the facts and circumstances, abuse of the requesting spouse's child * * * may constitute abuse of the requesting spouse" for purposes of the revenue procedure, the questionable provenance of Mr. Agudelo's exhibit and the fact that it recounts allegations of abuse by both spouses convince the Court that the facts and circumstances here do not support applications of this provision. Similarly unhelpful to Mr. Agudelo's cause are documents apparently reflecting he contacted U.S. and/or Columbian authorities to accuse Ms. Arias of lying on her U.S. visa application, smuggling cocaine, and using a false identity.

[*24] statures of the two parties at trial; unless Ms. Arias were armed with some form of weapon, we find it implausible that Mr. Agudelo would physically fear her.

Mr. Agudelo introduced a Spanish-language document that appears to be a record of sale for a parcel of real property in Colombia. The document identifies Ms. Arias as the sole purchaser and the purchase price as 37,900,000 Colombian pesos or, according to Mr. Agudelo, "around $20,000". During his testimony he referenced this document in describing Ms. Arias' alleged assets as compared with his own self-generated list of debts, presumably to bolster his allegation that Ms. Arias had controlled their mutual finances. When respondent's counsel drew Mr. Agudelo's attention to the fact that the document listed Mr. Agudelo as one of the sellers and stated that he was unmarried, he explained that he and his brother had inherited the land and claimed that Ms. Arias had "manipulated" him into transferring the property, paying only his brother. He alleged that Ms. Arias had told him to "present [him]self as single because it was all part of some imagination thinking into the future that she could sue people, like [respondent's counsel]". In turn, while Ms. Arias examined Mr. Agudelo, her questions suggested that he told her to put only her name on the sale record so that he would have to "give money to" his former wife.

[*25] The trial events described in the foregoing paragraphs are representative of the record as a whole. Mr. Agudelo and Ms. Arias accused each other of lies, abuse, perfidy and/or harassment. The only fact made abundantly clear by the numerous documents they introduced--many of which were either generated by the proponent or of questionable provenance--and by their testimony, is that their mutual animosity renders their allegations against one another not credible.[10] Furthermore, Mr. Agudelo did not establish any causal relationship between the alleged abuse and the omission of his unemployment compensation income from his and Ms. Arias' joint tax return. See, e.g., Deihl v. Commissioner, T.C. Memo. 2012-176, 103 T.C.M. (CCH) 1935, 1943 (2012), aff'd, ___ Fed. Appx. ___ (9th Cir. Feb. 24, 2015); Gaitan v. Commissioner, T.C. Memo. 2012-3, 103 T.C.M. (CCH) 1010, 1016 (2012).

On the record before us, we find that the abuse exception does not apply. Mr. Agudelo cannot satisfy the seven threshold conditions of Rev. Proc. 2013-34,

---

[10]If respondent's pretrial memorandum (PTM) accurately recounts the positions Mr. Agudelo and Ms. Arias took when communicating about this case with respondent before trial, then Mr. Agudelo changed his story. According to the PTM, Mr. Agudelo "allege[d] that intervenor retrieved the EDD checks from the mailbox, demanded that [he] * * * sign the checks, and deposited the money into her personal Chase bank account". At trial, in contrast, Mr. Agudelo insisted that he knew nothing about the checks and that any signature on them could not be his.

**[\*26]** supra; and on the basis of the entire record, the Court concludes that it would not be inequitable to hold him liable for the deficiency attributable to his unemployment compensation income. Accordingly, he does not qualify for relief from joint and several liability under section 6015(f).

IV. Conclusion

Mr. Agudelo received $10,320 of unemployment compensation from EDD during 2010, and Mr. Agudelo and Ms. Arias should have included that compensation in income on the 2010 joint tax return. Respondent's determinations in the notice of deficiency are sustained. Mr. Agudelo, who has the burden of proof, has not established that he qualifies for relief from joint and several liability under section 6015(b), (c), or (f).

The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered for respondent.